UNITED STATES, Appellee

v.

James A. MAXWELL, Jr., Colonel
U.S. Air Force, Appellant.

No. 95–0751.
Crim.App. No. 30704.

U.S. Court of Appeals for
the Armed Forces.

Argued June 25, 1996.

Decided Nov. 21, 1996.

For Appellant: *Frank J. Spinner* (argued); *Colonel Jay L. Cohen* and *Captain Richard D. Desmond* (on brief).

For Appellee: *Major Jane M.E. Peterson* (argued); *Colonel Jeffery T. Infelise* (on brief).

### Opinion of the Court

COX, Chief Judge:

Colonel Maxwell was convicted, contrary to his pleas, by a general court-martial composed of members at Goodfellow Air Force Base, Texas, of four specifications alleging violations of Article 134, Uniform Code of Military Justice, 10 USC § 934. According to ¶ 60c(1), Part IV, Manual for Courts–Martial, United States (1995 ed.):

> Article 134 makes punishable acts in three categories of offenses not specifically covered in any other article of the code. These are referred to as "clauses 1, 2, and 3" of Article 134. Clause 1 offenses involved [sic] disorders and neglects to the prejudice of good order and discipline in the armed forces. Clause 2 offenses involve conduct of a nature to bring discredit upon the armed forces. Clause 3 offenses involve noncapital crimes or offenses which violate Federal law including law made applicable through the Federal Assimilative Crimes Act.... If any conduct of this nature is specifically made punishable by another article of the code, it must be charged as a violation of that article.

The first two specifications of which appellant was convicted allege communication of indecent language, ¶ 89, Part IV, Manual, *supra* (1995 ed.), and ostensibly fall within the charging scheme of clauses 1 or 2, or both. The last two specifications of which appellant was convicted fall within the charging scheme of clause 3 of Article 134. One specification alleges violation of 18 USC § 1465 by knowingly transporting in interstate commerce, for purposes of distribution, obscene materials, and the other alleges violation of 18 USC § 2252 by knowingly transporting or receiving child pornography in interstate commerce. Appellant was sentenced to a dismissal. The convening authority approved the sentence as adjudged. The Court of Criminal Appeals affirmed the findings and sentence. 42 MJ 568, 583 (1995).

### INTRODUCTION

This case takes us into the new and developing area of the law addressing the virtual reality of "cyberspace," which is the generic term for the loosely connected network of computers that permits users of personal computers worldwide to communicate with each other. In this case, we deal with one specific computer subscription service— America Online (AOL). This service provides many self-contained communication services, such as informational bulletin boards and electronic mail (e-mail), as well as an efficient path to access the Internet. AOL is a private company that charges monthly fees based upon the type and amount of usage of their services. This case is solely concerned with AOL's e-mail service, although arguably the questions in this case may eventually arise in connection with any number of existing and constantly developing computer services. AOL e-mail allows users to communicate with other AOL subscribers on its own internal e-mail network. It is also possible to access other computer users outside the AOL subscription service, but this requires knowledge of a more lengthy and specific address of that user.

New technologies create interesting challenges to long established legal concepts. Thus, just as when the telephone gained nationwide use and acceptance, when automobiles became the established mode of transportation, and when cellular telephones came into widespread use, now personal computers, hooked up to large networks, are so widely used that the scope of Fourth Amendment core concepts of "privacy" as applied to them must be reexamined. Consequently, this opinion and the ones surely to follow will affect each one of us who has logged onto the "information superhighway."

### FACTS

Until shortly before preferral of charges, appellant had been Commander of Goodfellow Technical Training Center at Goodfellow Air Force Base, Texas, for almost 2 years. He was a widely respected career officer, with more than 25 years of service. Prior to

assumption of command at Goodfellow AFB, appellant initiated his subscription to AOL.

Appellant purchased and maintained all of his computer hardware, software, and accessories with his personal funds. Use of the equipment and services that are the subject of the charged offenses had no connection with his official duties. Appellant used the service only while at home and off-duty.

One of the services provided by AOL is the ability to communicate with others via each individual's personal computer terminal and computer telephone modem. The computer communicates with any on-line provider via a computer modem which transmits electronic impulses over telephone lines. These impulses are then read by the computer and transmitted into visual information, such as words, graphic images, or pictures. AOL's central computer bank, located in Vienna, Virginia, consists of a group of nine "Stratus Mini Computers" connected to data networks operated nationwide by the companies Sprint and Timenet. Users access the network by dialing a local telephone number for the geographic region in which they are located, and the call is then forwarded automatically by AOL to the computer bank in Vienna, Virginia. At the time of trial in 1993, there were approximately 600 cities nationwide connected to AOL's system network.

As part of registering with AOL, the subscriber first provides his or her name, address, and billing information, and an account is created for that individual on the system. The user then chooses at least one screen name (and may choose up to five) which identifies him or her while communicating on-line. These screen names are codes akin to CB handles, nicknames, and the like. However, the screen names are different from CB handles or nicknames in that the name must be typed exactly as selected or no communication can take place. No two users may have the same screen name. The user also has a password which is used to access the system before the screen name is used, and the quantity of usage of the screen names, as measured by time on-line, is tracked for billing purposes.

The example given at trial to illustrate the concept of screen name access was as follows: one user has one account with two screen names, Stevel and SteveM; but even though the same user possesses both names, Stevel would not be able to access SteveM's mailbox, and SteveM would not be able to access Stevel's mailbox. These names are treated like two identities.

There are three distinct methods of communication that may occur between subscribers. The first form is an "instant message," which allows a user to send a brief message of no greater than 300–500 characters to another user who happens to be on-line at the same time. These messages are not monitored by AOL and are not stored in the computer bank. This communication is most like a telephone conversation.

The second form of communication is called "chat." This communication occurs in an area on the computer called a "room," usually specified by subject, in which the user can enter and participate with a group of subscribers in a "conversation." To enter the "room," one first enters a "lobby" that lists the screen names of the other users in that area at that time. A user entering the lobby also sees a copy of the conversation that is then taking place. The user has the choice of joining the conversation or navigating to a specific interest by clicking on a symbol known as an "icon," that brings the user into a more specific "public room." One user entering the area is immediately seen by all the others. Public chats are monitored by AOL. Individuals "chatting" in the public area can leave the area and enter a "private room." Conversations are not monitored in the private rooms. These conversations are not maintained by AOL, but software is provided to the user to record his or her log of the messages that transpire. This form of communication is most akin to a telephone party line.

The third form of communication, and the one at issue in this case, is electronic mail, commonly known as e-mail. E-mail is a personal communication sent directly from one user to another. The recipient need not be logged into his computer at the time the

communication is sent in order to receive it. Communications may also be sent from one user to a group of users, and while many users only send mail to one user at a time, it is not uncommon for someone to send mail to 30 or 40 people at once.

The AOL software treats each screen name as having a separate "mailbox," meaning that the same user can send and receive e-mail under as many as five separate names, much like having five separate identities. The only authorized way to have access to an e-mail message is to be the recipient of the original message or a forwarded message. All of a user's mailboxes are distinct; thus if one has five separate screen names, that individual would have to log on to the system separately under each user name in order to retrieve all the e-mail received. Once the original e-mail message has been sent, the originator of the message has no control over to whom or how many times the message is forwarded.

All e-mail is stored in AOL's central computer for access and retrieval for 5 weeks to allow for the possibility of vacations and extended trips, and then messages are purged from the system. AOL executives and employees do not read or monitor e-mail.

Another feature of the e-mail service is the forwarding function, which allows a user to forward a piece of e-mail to other users with comments. The chain of forwarding will be indicated on each subsequent message. This process is much like copying and forwarding a letter; however, the path of the forwarded message is easily discerned, because the string of addressees attached to the message identifies, in order, each person who has read the message or passed it on, so it is far more specific than a postmark. Continuing this process can keep a message alive in the AOL system for an "infinite" period of time. Mark Seriff, the AOL expert, testified that the message will remain "as long as there is one of those forward references to it." If a recipient forwards a message, with or without reading it, the message will be removed from his mailbox, but the system will retain the message in memory.

A user can send attachments to an e-mail message. Anything that a user can store on a computer, including detailed graphics, can be sent attached to a piece of e-mail. Any picture can be converted into a computer graphic image by use of an additional piece of equipment, a scanner. The scanner reads either color or black-and-white images, and translates this information into data points, which can be read by the computer. The receiver of the file can see the graphics by using a software device called a graphic viewer. This software is typically obtained by downloading it from a bulletin board system, such as AOL. It is usually public domain software and is therefore obtained at no cost. Files containing graphics files or pictures usually have a Graphic Interchange Format ("GIF") suffix. However, there is no way to be sure that a file is a graphics file without first downloading it, running the viewing software program, and viewing the graphics themselves.

In December 1991, Roger D. Dietz, a resident of California and subscriber to AOL, reported to the press that child pornography was being distributed on AOL. He made this report after contacting his local police department and receiving little assistance. The press contacted AOL representatives who then called the FBI, who then contacted Mr. Dietz. He had also by this point forwarded several e-mail messages to AOL's vice-president of marketing, Ms. Jean Villanueva. Mr. Dietz provided copies of e-mail messages that he had received, along with graphics files (GIFs) to Ms. Villanueva, who gave them to FBI Agent Garrett. Agent Garrett opened an investigation and contacted AOL in order to obtain more information about the identities of the individuals using the screen names who appeared to be transmitting child pornography. When Agent Garrett contacted AOL for this purpose, he was informed that he would need a warrant in order to receive this information.

Following meetings with representatives from AOL and armed with the information that had been provided by Mr. Dietz, Agent Garrett contacted the United States Attorney's Office for the Eastern District of Virginia and received help from an assistant

United States Attorney in preparing his application for a warrant. After preparing the application and accompanying affidavit, the United States Attorney's Office presented the application and affidavit to the Federal Magistrate for the Eastern District of Virginia, who issued a search warrant for AOL's computer bank. The search warrant included approximately 80 or more screen names. These names were taken from the application for the search warrant,[1] which included a "user list" as well as "some of the child pornography that Dietz received from these individuals." Not all the GIFs were obviously obscene or involved minors. Further, on cross-examination, the AOL expert, Mark Seriff, stated that it would be impossible from just viewing the warrant, its attachments, and the affidavit to determine which user sent which graphic image. He stated that the agent would need at least one other list—an "e-mail chain"—to be able to determine who sent the pictures attached to the warrant.

However, unbeknownst to Agent Garrett, officials at AOL had begun to write a software program to extract the anticipated requested information, based upon the information already received from Mr. Dietz. One fact in issue is whether this program had already been run and the information compiled before the warrant was served.

Agent Garrett testified that AOL officials had already assembled 12,000–14,000 pages of computer fan-folded sheets and 39 high-density computer disks when he served the search warrant. These were turned over to him immediately upon presentation of the warrant and were only cursorily scanned. On the other hand, Mr. Seriff stated that the computer program used to retrieve all of this information was run only after the search warrant was presented. He testified that he quickly scanned the warrant and compared it to the master list which had been used to create the computer file retrieval software. Mr. Seriff then stated that he ran the program and turned over the responsive materials. He did not testify how long this process took. The exact chronology of the service of

the warrant and the running of the program were never unequivocally established.

The search warrant was written to allow seizure of information in the nine AOL computers located in Vienna, Virginia, for the specified subscribers, including all the e-mail for each user's screen name. Among the list of screen names contained in the information provided by Mr. Dietz was the screen name "Reddel" [as in Ready One]. However, when the list of screen names was ultimately transcribed for the warrant application and the search warrant, appellant's screen name "Reddel" was capitalized and mistakenly written as "REDDEL." The change of the last character in the name from a "1" to an "L" fundamentally changed the screen name. Thus, AOL computers would not have recognized this changed name as a valid screen name for appellant. In fact, the screen name "REDDEL" did not exist on AOL for any of AOL's subscribers. If AOL had not been provided a list of names in advance of service of the warrant and had not begun the search until the warrant was executed, then it is possible that appellant would not have been identified as a suspect. However, in preparing for the anticipated search, AOL prepared the search program from a list of screen names already provided by Mr. Dietz, which contained the correct screen names. Therefore, AOL did not take note of any of the transcription errors contained on the warrant, and it executed the search with all the correct screen names, including "Reddel," which identified appellant. In addition, the AOL program was more expansive than the federal search warrant and was designed to extract all the e-mail messages with any attached graphics files for not only all screen names appearing on the Dietz–FBI list, but also for all other screen names used by those subscribers. Included among these were transmissions appellant made under the screen name "Zirloc." The expansion of the search was conducted on AOL's expectation as to what the warrant would actually request, although the actual warrant was much more limited in scope as to the screen names to be searched.

1. *See* Appendix 1, which is a reproduction of the application and affidavit for the search warrant.

After the FBI seized the information and reviewed its contents, they discovered that an Air Force member (appellant) was involved in the investigated activities. The FBI then contacted the Air Force Office of Special Investigations (AFOSI) and turned over a copy of all the seized material to that office, which opened its own investigation of appellant. Included in the items turned over to AFOSI were e-mail transmissions made by appellant using the screen name "Zirloc," even though these transmissions did not have any connection with the transfer of questionable graphics files. Many of the e-mail transmissions made by appellant as "Zirloc" were to another junior Air Force officer known as "Launchboy." The electronic transmissions discussed appellant's feelings regarding his sexual orientation and desires, and appellant answered questions regarding his sexual preferences. These communications were the subject of the indecent-language specifications.

After receiving the AOL information from the FBI, AFOSI sought a search authorization from Colonel Kenton D. McHenry, vice commander of Goodfellow Training Center.

**2.** The granted issues were as follows:

I

WHETHER 18 USC § 1465 CAN BE CONSTRUED CONSTITUTIONALLY TO APPLY TO THE INTERSTATE DISTRIBUTION OF ALLEGEDLY OBSCENE VISUAL DEPICTIONS TRANSMITTED VIA COMPUTER ON–LINE SERVICES WHICH UTILIZE TELEPHONE LINES.

II

WHETHER A CHARGE OF COMMUNICATING INDECENT LANGUAGE CAN BE MADE UNDER THE FIRST AND FIFTH AMENDMENTS WHERE THE ADULT PARTIES TO THE COMMUNICATION ENGAGED IN THEIR COMMUNICATIONS IN A PRIVATE, NON–COMMERCIAL, CONSENSUAL SETTING.

III

WHETHER THE MILITARY JUDGE INCORRECTLY DENIED APPELLANT'S FOURTH AMENDMENT CLAIMS IN CHALLENGING THE VALIDITY OF THE SEARCH WARRANT ISSUED BY A FEDERAL MAGISTRATE AND USED BY THE FBI TO SEIZE EVIDENCE FROM COMPUTERS AT AMERICA ONLINE (A PRIVATE NATIONAL COMPUTER SERVICE), IN THE FOLLOWING RESPECTS:

A

PROBABLE CAUSE WAS NOT ESTABLISHED TO JUSTIFY ISSUANCE OF THE

Colonel McHenry had been appointed by appellant as the military magistrate for Goodfellow. The meeting to discuss probable cause for a search authorization lasted more than an hour, and included Colonel McHenry, several AFOSI agents, and a judge advocate. Based on all of the information presented to Colonel McHenry, including the information provided by Mr. Dietz, Colonel McHenry issued a search authorization directing the agents to search appellant's quarters. The authorization specified that all evidence be seized related to the "possession and transmission of child pornography and other obscene matter." The item seized from Colonel Maxwell's quarters was his Apple Macintosh computer. The computer was subsequently searched at the AFOSI offices, and three visual depictions were downloaded from graphics files located on the computer. These were admitted into evidence on the child-pornography specification after the military judge denied the motion to suppress.

### DISCUSSION

The granted issues [2] can be grouped into five main areas:

WARRANT AGAINST APPELLANT'S FILES AS MAINTAINED BY AMERICA ONLINE, IN THAT APPELLANT WAS NOT IDENTIFIED IN THE WARRANT AND NO NEXUS WAS SHOWN TO EXIST BETWEEN HIS COMMUNICATIONS ON AMERICA ONLINE AND ANY ALLEGED CRIMINAL MISCONDUCT.

B

THE WARRANT, WHICH ALLEGED A SUSPECTED VIOLATION OF THE FEDERAL CHILD PORNOGRAPHY STATUTE, 18 USC § 2252, CONSTITUTED A "GENERAL" WARRANT IN THAT IT AUTHORIZED THE SEIZURE OF *ALL* ELECTRONIC MAIL SENT OR RECEIVED BY THE LISTED SUBSCRIBERS, WITHOUT LIMITATION AND WITHOUT EMPLOYING ANY LESSER INTRUSIVE MEANS TO AVOID INFRINGING APPELLANT'S FIRST AMENDMENT FREEDOM OF EXPRESSION.

C

THE WARRANT WAS NOT PROPERLY EXECUTED IN THAT THE SEARCH FOR EVIDENCE WAS CONDUCTED AT NIGHT BY AMERICA ONLINE'S EMPLOYEES BEFORE THE WARRANT WAS SERVED ON AMERICA ONLINE.

D

A "GOOD–FAITH" BASIS DOES NOT EXIST TO EXCUSE THE ERRORS COMMITTED IN

First, appellant challenges the validity of the search of AOL. He contends that the warrant issued by the federal magistrate should be held constitutionally infirm for three reasons: (1) that the typographical error in the warrant authorizing a search of "REDDEL" in place of "Reddel" [Ready One] invalidates the search of the "Reddel" files; (2) that the warrant was overly broad and thus violated the Fourth Amendment prohibition against general search warrants; (3) that the seizure of the "Zirloc" materials was not provided for by the warrant and was not subject to the "good-faith" exception, to the exclusionary rule; thus the exclusionary rule should be invoked as to all the files seized from that screen name.

Second, appellant challenges the search authorization given by Colonel McHenry, the military magistrate for the base, on the following grounds: (1) that the authorization was improperly issued based upon use of Colonel McHenry's personal legal standard for determining probable cause, rather than the constitutionally mandated standard; (2)

OBTAINING AND EXECUTING THE SEARCH WARRANT.

### IV

WHETHER THE MILITARY JUDGE INCORRECTLY DENIED THE APPELLANT'S FOURTH AMENDMENT CLAIMS IN CHALLENGING THE SEARCH AUTHORIZATION ISSUED BY THE MILITARY MAGISTRATE AND USED BY THE OFFICE OF SPECIAL INVESTIGATIONS TO SEIZE EVIDENCE FROM APPELLANT'S HOME, IN THE FOLLOWING RESPECTS:

### A

THE MAGISTRATE RELIED ON EVIDENCE ILLEGALLY OBTAINED FROM THE SEARCH OF AMERICA ONLINE'S COMPUTERS AS SET FORTH IN ISSUE [III], ABOVE.

### B

PROBABLE CAUSE WAS NOT ESTABLISHED TO JUSTIFY ISSUANCE OF THE AUTHORIZATION, IN THAT THE MAGISTRATE LACKED KNOWLEDGE OF ANY LEGAL STANDARD BY WHICH TO MEASURE WHETHER VISUAL DEPICTIONS CONSTITUTED EITHER CHILD PORNOGRAPHY OR OBSCENE MATTER AND WHERE THE INFORMATION RELIED UPON BY THE MAGISTRATE WAS STALE.

### C

THE AUTHORIZATION CONSTITUTED A "GENERAL" WARRANT, IN THAT IT DID NOT DESCRIBE WITH PARTICULARITY THE ITEMS TO BE SEIZED AND GAVE THE AGENTS UNFETTERED DISCRETION TO DETERMINE WHAT CONSTITUTED CHILD PORNOGRAPHY AND OBSCENE MATTER.

### D

A "GOOD-FAITH" BASIS DOES NOT EXIST TO EXCUSE THE ERRORS COMMITTED IN OBTAINING AND EXECUTING THE SEARCH AUTHORIZATION.

### V

WHETHER THE MILITARY JUDGE COMMITTED PREJUDICIAL ERROR BY ADMITTING INTO EVIDENCE HARD COPIES OF PORNOGRAPHIC VISUAL IMAGES DRAWN FROM CYBERSPACE, IN VIOLATION OF THE BEST EVIDENCE RULE, MIL.R.EVID. 1002.

### VI

WHETHER THE MILITARY JUDGE CORRECTLY INSTRUCTED THE MEMBERS REGARDING SCIENTER AFTER DENYING APPELLANT'S CONSTITUTIONAL CHALLENGE TO 18 USC § 2252, WHERE HE SAID THAT IN ORDER TO CONVICT APPELLANT THEY MUST BE CONVINCED THAT "HE KNEW OR BELIEVED" THE PERSONS DEPICTED WERE UNDER 18 YEARS OF AGE.

### VII

WHETHER THE MILITARY JUDGE CORRECTLY INSTRUCTED THE MEMBERS REGARDING COMMUNITY STANDARDS, WHERE HE SAID THAT "COMMUNITY STANDARDS ARE SET BY WHAT IS IN FACT ACCEPTED IN OUR NATIONWIDE COMMUNITY AS A WHOLE" AND "IN DETERMINING THE COMMON CONSCIENCE OF THE COMMUNITY, YOU ARE TO CONSIDER THE COMMUNITY AS A WHOLE, YOUNG AND OLD."

### VIII

WHETHER THE MILITARY JUDGE COMMITTED PREJUDICIAL ERROR BY FAILING TO DEFINE COMMUNITY STANDARDS WHEN HE INSTRUCTED THE MEMBERS ON THE ESSENTIAL ELEMENTS OF SPECIFICATION 1 UNDER CHARGE II, COMMUNICATING INDECENT LANGUAGE.

### IX

WHETHER THE SENTENCE TO A DISMISSAL CONSTITUTES CRUEL AND UNUSUAL PUNISHMENT UNDER THE EIGHTH AMENDMENT WHERE, IF EXECUTED, IT WILL LEAD TO APPELLANT'S LOSS OF RETIREMENT BENEFITS APPROXIMATING ONE MILLION DOLLARS IN VALUE IN COMPENSATION ALONE.

We also specified this issue:

WHETHER APPELLANT, AS A SUBSCRIBER OF AMERICA ONLINE, POSSESSED A REASONABLE EXPECTATION OF PRIVACY IN THE ELECTRONIC MAIL MESSAGES HE SENT AND/OR RECEIVED AND WHICH WERE STORED IN AMERICA ONLINE'S COMPUTERS.

that consideration of the materials seized by the FBI improperly allowed Colonel McHenry to rely upon the "fruits of the poisonous tree" of the FBI warrant.

Third, appellant questions the instructions given by the military judge in a three-fold challenge: (1) whether the judge gave proper instructions to the members on the "scienter" element of the child-pornography offense; (2) whether the judge properly gave the "community-standards" instruction for the obscenity specification; and (3) whether the judge properly gave the "community-standards" instruction for the indecent-language specification.

Fourth, appellant argues that the language that is the subject of the indecent-language specification is constitutionally protected by the First Amendment.

Fifth, appellant argues that a sentence to be dismissed from the Air Force for the crimes of which appellant has been convicted constitutes "cruel and unusual punishment" under the Eighth Amendment to the United States Constitution[3] or "cruel or unusual punishment" under the Uniform Code of Military Justice.[4]

## I. Warrants and the Search of Computers

The first question which we must resolve is the validity of the search of AOL's files by the FBI and seizure of pornographic material and e-mail identified with appellant. As discussed earlier, the FBI obtained a search warrant authorizing it to search the AOL computers for information distributed to or by a list of customers, including the customer identified in the warrant as REDDEL. The warrant did not authorize the search of the computer files for e-mail or pornographic material distributed to or by "Reddel" [Ready One], appellant's password, or by a customer using the password "Zirloc," anoth-

er password belonging to appellant. Nonetheless, the FBI seized all AOL file material relating to "Reddel" and "Zirloc."

Further complicating the search, five things are clear from the record. First, the search of the files was conducted by employees of AOL, rather than the FBI. Second, the search was conducted at the request of the FBI, pursuant to a search warrant issued by a United States Magistrate Judge, which contained at least 20 or more errors. Third, the seizure of files far exceeded the plain language of the warrant. Fourth, although AOL relied generally upon the authority of the warrant to conduct its search of its files, it is quite evident that they did not rely upon the specific authority of the warrant to design its search programs. If it had, it would not initially have searched for either "Reddel" or "Zirloc." Lastly, it is clear that, prior to the search, there was no probable cause to believe that a search of AOL's file under the password "Zirloc" would reveal evidence of a crime or pornographic contraband.

Because the search was conducted at the computer center of AOL and consisted of searching AOL's records and files, rather than a search of a private home or appellant's computer, we must resolve whether appellant may contest the search and resulting seizure. This requires us to decide whether appellant has established a reasonable expectation of privacy in the AOL e-mail system. *Rawlings v. Kentucky*, 448 U.S. 98, 104–06, 100 S.Ct. 2556, 2561–62, 65 L.Ed.2d 633 (1980); *see United States v. Ayala*, 26 MJ 190, 191 (CMA 1988), citing *Smith v. Maryland*, 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979) (person claiming right of privacy under Fourth Amendment has burden of proof).

In answering these questions, we have examined the relationship between appellant

---

**3.** The Eighth Amendment states: "Excessive bail shall not be required nor excessive fines imposed, nor cruel *and* unusual punishments inflicted." (Emphasis added.)

**4.** Article 55, Uniform Code of Military Justice, 10 USC § 855, entitled **Cruel and unusual punishments prohibited** states:

Punishment by flogging, or by branding, marking, or tattooing on the body, or any other cruel *or* unusual punishment, may not by adjudged by any court-martial or inflicted upon any person subject to this chapter. The use of irons, single or double, except for the purpose of safe custody, is prohibited.
(Emphasis added.)

and AOL from four different perspectives. First, the technology used to communicate via e-mail is extraordinarily analogous to a telephone conversation. Indeed, e-mail is transmitted from one computer to another via telephone communication, either hard line or satellite. We have recognized that "[t]elephone conversations are protected by the Fourth Amendment if there is a reasonable expectation of privacy." *United States v. Sullivan*, 42 MJ 360, 363 (1995). Second, the federal statutes afford protection from disclosure of intercepted communications absent a duly issued search warrant. *See* 18 USC §§ 2701–11. Third, AOL's contractual obligations with appellant insured him privacy. Last, the tenor and content of the e-mail conversations between appellant and his correspondent, "Launchboy," reveal a reasonable expectation that the conversations were private.

### A. Expectation of Privacy

■ A person may challenge the validity of a search only by asserting a "subjective expectation of privacy" which is objectively "reasonable." *See Minnesota v. Olson*, 495 U.S. 91, 95, 110 S.Ct. 1684, 1687, 109 L.Ed.2d 85 (1990). "Whether a party has manifested a subjective expectation of privacy is a question of fact, reviewed under the clearly erroneous standard. Whether that subjective expectation is objectively reasonable is a matter of law subject to *de novo* review." *Tri–State Steel Construction, Inc. v. Occupational Safety & Health Review Commission*, 26 F.3d 173, 176 (D.C.Cir.1994) (citation omitted).

■ AOL differs from other systems, specifically the Internet (*see American Civil Liberties Union, et al., v. Reno*, 929 F.Supp. 824, 830–44 (E.D.Pa.1996)), in that e-mail messages are afforded more privacy than similar messages on the Internet, because they are privately stored for retrieval on AOL's centralized and privately-owned computer bank located in Vienna, Virginia. During her testimony, Ms. Villanueva stated that AOL's policy was not to read or disclose subscribers' e-mail to anyone except authorized users, thus offering its own contractual privacy protection in addition to any federal

statutory protections. It was AOL's practice to guard these "private communications" and only disclose them to third parties if given a court order. Just for comparison, the Internet has a less secure e-mail system, in which messages must pass through a series of computers in order to reach the intended recipient. *Cf. ACLU v. Reno, supra.* While implicit promises or contractual guarantees of privacy by commercial entities do not guarantee a constitutional expectation of privacy, we conclude that under the circumstances here appellant possessed a reasonable expectation of privacy, albeit a limited one, in the e-mail messages that he sent and/or received on AOL. Expectations of privacy, however, have limitations, and this case illustrates some of them.

■ We are satisfied that the Constitution requires that the FBI and other police agencies establish probable cause to enter into a personal and private computer. *Cf. United States v. Villegas*, 899 F.2d 1324, 1334–35 (2d Cir.1990); *see also* 18 USC § 2703(a). However, when an individual sends or mails letters, messages, or other information on the computer, that Fourth Amendment expectation of privacy diminishes incrementally. *Cf. Gouled v. United States*, 255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 647 (1921). Moreover, the more open the method of transmission, such as the "chat room," the less privacy one can reasonably expect. This case alone presents a spectrum of privacy expectations, which we address herein.

■ E-mail transmissions are not unlike other forms of modern communication. We can draw parallels from these other mediums. For example, if a sender of first-class mail seals an envelope and addresses it to another person, the sender can reasonably expect the contents to remain private and free from the eyes of the police absent a search warrant founded upon probable cause. *Cf. Gouled v. United States, supra.* However, once the letter is received and opened, the destiny of the letter then lies in the control of the recipient of the letter, not the sender, absent some legal privilege. *See* Mil. R.Evid. 501–06, Manual for Courts–Martial,

418

United States, 1984. *Cf. Gouled,* 255 U.S. at 302, 41 S.Ct. at 262.

■ Similarly, the maker of a telephone call has a reasonable expectation that police officials will not intercept and listen to the conversation; however, the conversation itself is held with the risk that one of the participants may reveal what is said to others. *United States v. Sullivan, supra; see Hoffa v. United States,* 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966); *United States v. Parrillo,* 34 MJ 112 (CMA 1992).

■ Drawing from these parallels, we can say that the transmitter of an e-mail message enjoys a reasonable expectation that police officials will not intercept the transmission without probable cause and a search warrant. However, once the transmissions are received by another person, the transmitter no longer controls its destiny. In a sense, e-mail is like a letter. It is sent and lies sealed in the computer until the recipient opens his or her computer and retrieves the transmission. The sender enjoys a reasonable expectation that the initial transmission will not be intercepted by the police. The fact that an unauthorized "hacker" might intercept an e-mail message does not diminish the legitimate expectation of privacy in any way.

There is, however, one major difference between an e-mail message which has been transmitted via a network such as AOL and a direct computer "real time" transmission. The former transmission is stored in a centralized computer until the recipient opens his or her network and retrieves the e-mail, while the latter is lost forever, unless one of the communicators chooses to download the conversation to a disk. This latter action would be much like clandestinely recording one's telephone conversation. Thus, while a user of an e-mail network may enjoy a reasonable expectation that his or her e-mail will not be revealed to police, there is the risk that an employee or other person with direct access to the network service will access the e-mail, despite any company promises to the contrary. One always bears the risk that a recipient of an e-mail message will redistribute the e-mail or an employee of the company will read e-mail against company policy.

However, this is not the same as the police commanding an individual to intercept the message.

Also, in another context, the relationship of a computer network subscriber to the network is similar to that of a bank customer to a bank. So far as the company's records are concerned, there is no reasonable expectation that the records are private, and the customer has no control whatsoever over which employees may see the records. *United States v. Wooten,* 34 MJ 141, 147 (CMA 1992); *see also* 18 USC §§ 2701–08.

■ The Government has argued that appellant forfeited any expectation of privacy in his e-mail messages through the e-mail forwarding process. If we accept this premise, any information forwarded would not be subject to Fourth Amendment protections. This argument parallels the rationale used by the Supreme Court in *Hoffa v. United States, supra.* In *Hoffa,* the Court decided that notorious labor leader, James "Jimmy" Hoffa, had no Fourth Amendment protection for a conversation overheard by a government informant who had been invited to be present. The Court reasoned that there is no protection under the Fourth Amendment for "a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it." 385 U.S. at 302, 87 S.Ct. at 413. Justice Stewart went on to say: "The risk of being overheard by an eavesdropper or betrayed by an informer or deceived as to the identity of one with whom one deals is probably inherent in the conditions of human society. It is the kind of risk we necessarily assume whenever we speak." *Id.* at 303, 87 S.Ct. at 414, quoting *Lopez v. United States,* 373 U.S. 427, 465, 83 S.Ct. 1381, 1402, 10 L.Ed.2d 462 (1963) (Brennan, J., dissenting); *see also Parrillo,* 34 MJ at 118 (lack of expectation of privacy in one overhearing telephone call); *United States v. Sturdivant,* 13 MJ 323, 326 (CMA 1982) (lack of expectation of privacy in a business telephone line with multiple extensions).

■ We agree to a limited extent with the Government. Expectations of privacy in

e-mail transmissions depend in large part on the type of e-mail involved and the intended recipient. Messages sent to the public at large in the "chat room" or e-mail that is "forwarded" from correspondent to correspondent lose any semblance of privacy. Once these transmissions are sent out to more and more subscribers, the subsequent expectation of privacy incrementally diminishes. This loss of an expectation of privacy, however, only goes to these specific pieces of mail for which privacy interests were lessened and ultimately abandoned. Thus, any of the material or information seized and turned over to the FBI or to other police agencies by Mr. Dietz was "fair game" for introduction into evidence and for use in procuring a search warrant. However, once the Government wanted to search the computer files further based upon these chance scraps of information, a warrant was required.

Since an expectation of privacy exists in e-mail transmissions made on the AOL service, we must look at the validity of the warrant in order to determine whether it was properly obtained and executed.

## B. Validity of Federal Warrant and Military Search Authorization

This case presents two levels of questions as to whether the expectation of privacy in this case was validly overcome by correct and constitutionally sound procedures. The FBI first sought a federal search warrant. Based upon the fruits of that search, the AFOSI was subsequently contacted and provided all the recovered materials. After receiving the recovered materials, the AFOSI sought the functional equivalent of a search warrant in the military, *i.e.*, a search authorization, from the military equivalent of a magistrate, in this case the base vice commander. We review both.

### 1. Federal Magistrate Judge's Warrant

[redacted] We review *de novo* the question whether the warrant was sufficient. *See United States v. Noushfar,* 78 F.3d 1442, 1447 (9th Cir.1996). We first review the warrant to determine whether use of the screen name REDDEL in the warrant rather than appellant's screen name, Reddel [Ready One], rendered it defective. Second, we evaluate the breadth of the warrant to determine whether it was a "general warrant" prohibited by the Fourth Amendment. Third, we review whether the seizure of the "Zirloc" e-mail was properly permitted by the warrant, and assuming *arguendo* it was not, we review the warrantless search to determine whether or not the seizure was lawful under one of the exceptions to the warrant requirement.

#### a. Defective Warrant

[redacted] The FBI procured the warrant from a Federal Magistrate Judge for the Eastern District of Virginia based upon an affidavit submitted by FBI Special Agent Garrett, linking together the e-mail transmissions received from Mr. Dietz with the screen names to be searched. The FBI had retyped the screen names to be searched from the assortment of e-mail messages that Mr. Dietz had provided to AOL, who subsequently turned the messages over to the FBI. In retyping those screen names, numerous scrivener's errors were made, the most important one in this case being the capitalization of "Reddel" to mistakenly represent the screen name as "REDDEL."

Although it is clear that conversations were held between AOL and the FBI concerning the warrant prior to actual service of the warrant, the warrant was limited to screen names revealed to the United States Magistrate Judge by the Dietz material. However, wittingly or unwittingly, the warrant[5] was drafted in language purporting to authorize seizure of the e-mail of each "user" listed. The term "user" denotes a broader area to be searched than the more limited term "screen name" and may include the e-mail for several screen names. Ultimately, one "user" could be several individuals. Different screen names on the same "user" account could theoretically belong to different individuals, such as members of a family, who are only billed on the same account for their own convenience. To AOL the word "user" carried a much broader meaning which en-

5. The text of the warrant is reproduced in Appendix 2.

compassed all of a particular account's screen names, not just those that were listed in the warrant. Thus, although the FBI had probable cause only as to the listed screen names, use of the word "user" rather than the word "screen name" imparted a much broader meaning to one familiar with the technology and terminology. It is clear from the record that the FBI agents working on this particular case were not fluent in AOL computer terminology. However, it is equally apparent that both the FBI and AOL were clear regarding the listed mailboxes to be searched. It is unclear what the actual understanding was as to those screen names that were not listed in the warrant, but that happened to be on the same user account as the listed screen names. AOL's inclusion of e-mail associated with screen names not listed in the warrant created a scope of seizure much larger than that established by probable cause.

In any event, AOL had already formulated a program to retrieve the information that the FBI desired prior to service of the warrant. As indicated, this program was developed from the list provided by the government informant, Mr. Dietz, but retrieved a much greater amount of information than the e-mail for each listed screen name. Although the warrant contained approximately 20 typographical errors, only one error, the changing of the screen name to be searched from "Reddel" [Ready One] to "REDDEL," related to appellant. To the extent that errors existed in the warrant, we hold that these scrivener's errors do not invalidate the warrant. *See United States v. Arenal,* 768 F.2d 263 (8th Cir.1985) (upholding search despite typographical error in search warrant transposing address numbers); *United States v. Christopher,* 546 F.2d 496, 497 (2d Cir.1976) (holding accidental transposition of room numbers did not render search illegal since it was clear that the room actually searched was the intended location); *United States v. Larracuente,* 740 F.Supp. 160, 164–65 (E.D.N.Y.1990) (accidental transposition of room numbers did not invalidate search). Here, the search warrant was issued in reliance upon the affidavit prepared by Special Agent Garrett of the FBI. This affidavit was in turn based upon the information received from AOL, who had received the e-mail messages and GIFs from Mr. Dietz, who had lawfully obtained the materials as an addressee through his personal subscription to AOL. The transcription error was made as a result of improperly capitalizing the screen names. This was a minor and honest mistake. Both AOL and the FBI were clear that they were searching "Reddel," and not "REDDEL." Therefore, we will not invalidate the warrant on this basis.

## b. Overly Broad Warrant

The second prong of the inquiry is whether the warrant was overly broad, resulting in a general search prohibited by the Fourth Amendment. We review this issue *de novo. See United States v. Harris,* 903 F.2d 770, 774 (10th Cir.1990). Appellant argues that the warrant is a general warrant prohibited by the Fourth Amendment because the warrant: (1) included names of those merely receiving obscenity and unknowingly receiving child pornography, as opposed to only those transmitting obscenity and knowingly receiving child pornography, which are the only illegal acts, and (2) lacked an identifiable "e-mail chain" to conclusively link the copies of the GIFs presented to the magistrate with the separate typed list of screen names provided as an attachment to the warrant application. We hold that the warrant is not a general warrant and that the fruits of the search are admissible. *See* Mil. R.Evid. 311(b), Manual, *supra* (1995 ed.); *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

Any attempt to further narrow the field of names to be searched in order to weed out those who might have unknowingly received the illegal materials would have resulted in an advance search of those recipients' mailboxes. The advance search would have been necessary to determine whether the graphics files had been downloaded, the viewing software had been run, and the files had been saved. Thus, inclusion of these names in the warrant was entirely reasonable. *See, e.g., Scott v. United States,* 436 U.S. 128, 141–43, 98 S.Ct. 1717, 1725–26, 56 L.Ed.2d 168 (1978) (interception reasonable in electronic surveil-

lance case even though 60 percent of calls irrelevant to investigation). We therefore reject this argument.

Additionally, we concur with the Court of Criminal Appeals' holding that the affidavit [6] submitted by the FBI special agent in support of the warrant was sufficient to connect the GIFs with the list of e-mail screen names. *See* 42 MJ at 577. We decline to establish a more substantial burden as requested by appellant to impose unreasonably restrictive requirements for preparation of a search warrant. The standard for establishing probable cause is just that—"probable." We will not raise the level of persuasion to "beyond a reasonable doubt."

### c. Improper Seizure

■■■ The third prong of the inquiry questions whether the e-mail that appellant sent as "Zirloc" was improperly seized pursuant to the warrant. We review this question *de novo*, since it is more properly characterized as whether this e-mail was specified in the warrant, *see United States v. Noushfar, supra,* or if seizure of this additional information was the result of a warrantless search, *see United States v. Rambo,* 74 F.3d 948, 952 (9th Cir.1996). We decline to adopt the Court of Criminal Appeals' rationale that the contents of other mailboxes belonging to screen-name identities separate from those listed on the warrant are admissible pursuant to the "good-faith" exception of *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). We hold that the "good-faith" exception is not applicable to this case. *Id.* at 918 n. 19, 104 S.Ct. at 3418 n. 19.

In order for the "good-faith" exception to the exclusionary rule to apply here, it must be clear that the agents doing the search were relying on a defective warrant. Here, it is clear to us that AOL did not rely on the precise language in the warrant; rather, they developed their own search program and retrieved the information pursuant to that program. It is clear that AOL really relied upon the list of names that they already had in their possession and their conversations with the FBI prior to the search. Thus, there was no reliance on the language of the

warrant for the scope of the search. AOL had already determined which records were going to be released prior to receiving the warrant. The company treated the warrant as a legal "green light" to release the material that they had apparently already compiled. We thus decline to uphold admission of appellant's "Zirloc" transmissions based upon the "good-faith" exception to the warrant requirement because it is clear that no warrant was relied upon to search these accounts.

■■ Moreover, even if this question were closer, there are other considerations which outweigh application of the "good-faith" exception in these instances. As an obvious example, an AOL account could be shared by a family who uses different screen names, but is billed in the name of one individual. We are unpersuaded, considering only this record, to declare others' expectations of privacy to be forfeited based upon some undefined "good-faith" exception. However, we do not halt our review here.

■■ We must also consider whether the "Zirloc" transmissions are, nevertheless, admissible because of some other theory of law. Two arguments are advanced for our consideration. First, it is argued that AOL voluntarily seized these materials of their own accord, since it had constructed the computer retrieval program prior to service of the warrant. The mere construction of the computer program prior to service of the warrant alone might be insufficient to render the search private, since the program was constructed in response to government action. However, Agent Garrett testified that all the information had already been compiled before service of the warrant and that the information was waiting for him to seize upon his arrival at AOL's offices. It is undisputed that the material seized at this time consisted of over 12,000 pages of computer fan-folded sheets and 39 high-density computer disks. The AOL representative, Mr. Seriff, testified on direct examination that he ran the software extraction program only after he was presented the warrant and had made a cur-

---

**6.** *See* n. 1, *supra.*

sory comparison with the screen names used as the basis for the program. It cannot be denied that assembly of such a voluminous amount of materials would have consumed a significant period of time, therefore lending more credence to Agent Garrett's recollection of events. In any event, it is clear to us that seizure of the e-mail in the "Zirloc" mailbox was not authorized by the warrant and that AOL did not rely on the language of the warrant to formulate its search.

Even though AOL did not rely on any language in the warrant in order to seize the "mail" from the accounts possessed by the screen names listed in the warrant, we cannot save this "Zirloc" search on the basis of its being a "private search." It is clear to us that the AOL search was at the behest of the FBI and pursuant to the search warrant authority. AOL gathered the evidence at the request of the Government, in anticipation of a warrant, and solely for the purpose of surrendering it to government authorities to satisfy the warrant. *See Coolidge v. New Hampshire,* 403 U.S. 443, 487, 91 S.Ct. 2022, 2049, 29 L.Ed.2d 564 (1971) ("The test … is whether Mrs. Coolidge, in light of all the circumstances of the case, must be regarded as having acted as an 'instrument' or agent of the state when she produced" the challenged items.); *see also United States v. Miller,* 688 F.2d 652, 656 (9th Cir.1982).

#### d. Plain View

■ We next consider whether the search by the FBI of the "Zirloc" material was authorized by the "plain view" doctrine. The Supreme Court has recognized that if police are legitimately in a place where a citizen has a right of privacy, the police may seize contraband or other evidence of crime that is in "plain view." *See Coolidge v. New Hampshire, supra.* We decline, however, to hold the search of the "Zirloc" files was valid under a plain-view analysis. Because the warrant did not authorize the search of these files, the view was obtained as a result of the improper governmental "opening" of the files and not as a result of seeing what was legitimately in "plain view." The search here exceeded the scope of the search warrant; thus the "plain-view" exception does not ap-

ply. *See Leon,* 468 U.S. at 918 n. 19, 104 S.Ct. at 3418 n. 19.

#### e. Inevitable Discovery

■ Now, we consider whether the "Zirloc" files may have been "inevitably discovered" under the facts of this case. *See Nix v. Williams,* 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). Our review of the testimony and the findings by the military judge leads us to conclude that the "Zirloc" files would not have been inevitably discovered in this case. The FBI and the AFOSI had ample, validly seized, evidence under the screen name "Redde1" [Ready One]. Once they pursued the evidence seized from appellant's home—the personal computer—we are satisfied that the search would have stopped. There is no evidence to the contrary. Whether the files belonging to "Zirloc" would have been eventually recovered from this search is only a matter of mere speculation and conjecture, in which we will not engage.

Accordingly, we conclude that the evidence seized by the FBI pursuant to the warrant was validly and lawfully seized under the screen name "Redde1" [Ready One] notwithstanding the error in the warrant. The evidence seized under the name "Zirloc" exceeded the scope of the warrant, was not in plain view, and would not have been inevitably discovered through the search of the separate identity, "Redde1."

#### f. Fruit of the Poisonous Tree

■ The last question that we must face regarding the "Zirloc" material is whether or not the exclusionary rule would prevent the Government from introducing the e-mail conversations from appellant to his correspondent, "Launchboy," which were all seized during the "Zirloc" search. Mil.R.Evid. 311(a) provides that evidence seized by a person acting in a governmental capacity is inadmissible if it is seized under circumstances which would give the servicemember grounds to object under the Constitution of the United States as applied to servicemembers. Thus, although we find no police "misconduct" or any evidence that either the police or AOL was acting in "bad faith," we know of no authority which would allow ad-

mission of this private e-mail conversation seized without probable cause or a valid warrant. Accordingly, we hold that the fruits of the "Zirloc" search were inadmissible. Contrarily, we hold that the fruits of the "Reddel" search were admissible.

## 2. Validity of Military Search Authorization

■ The military judge did not err in denying appellant's Fourth Amendment challenge to the search authorization issued by the military magistrate.

The issue is whether the military magistrate, Colonel McHenry, correctly determined that probable cause existed. *United States v. Lopez*, 35 MJ 35 (CMA 1992). Quoting from our decision in *Lopez*, we said:

An impartial commander may authorize a search based on probable cause. Mil. R.Evid. 315(f)(2) provides, "Probable cause to search exists when there is a reasonable belief that the ... property ... sought is located in the place ... to be searched." In determining whether there is probable cause the commander will apply the totality-of-the-circumstances test of *Illinois v. Gates*, 462 U.S. 213, 233, 103 S.Ct. 2317, 2329, 76 L.Ed.2d 527 (1983).

35 MJ at 38.

■ Judge Crawford, writing for the Court, concluded: "In summary, the information considered by the individual authorizing a search must make it more probable than not that the item is located at the place to be searched." 35 MJ at 39. *See generally* S. Childress & M. Davis, 2 *Federal Standards of Review* § 11.11 at 11–45 (2d ed. 1992). In reviewing a decision that there was probable cause for a search, we must keep in mind that "a determination of probable cause by a neutral and detached magistrate is entitled to substantial deference. *United States v. Ventresca*, 380 U.S. 102, 109, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965)." *United States v. Oloyede*, 982 F.2d 133, 138 (4th Cir.1993). *Ventresca* counseled that "resolution of doubtful or marginal cases ... should be largely determined by the preference ... [for] warrants." 380 U.S. at 109, 85 S.Ct. at 746. *See Gates*, 462 U.S. at 236, 103 S.Ct. at

2331. This means "that close calls will be resolved in favor of sustaining the magistrate's decision." *See* S. Childress & M. Davis, *supra* § 11.11 at 11–48.

Here, Colonel McHenry considered all the information obtained by the FBI and logically rationalized that more evidence of criminal activities, specifically evidence of appellant's distribution of obscenity and child pornography, would be located on appellant's computer and in his quarters. Colonel McHenry was neutral and detached in that he had no ill motive and "was not motivated solely by revenge or vindictiveness." *See Lopez*, 35 MJ at 42 (footnotes omitted). In fact, Colonel McHenry believed himself to be a friend of appellant, and the testimony illustrates that he considered his decision very carefully, examining very closely all the materials presented to him and taking well over one hour to reach a decision. If anything, Colonel McHenry bent over backwards to give his friend every benefit of the doubt.

■ Appellant contends that Colonel McHenry, in reaching his decision, improperly used a personal standard of obscenity to evaluate the photographs and was not informed of the exact text of the statutes appellant was suspected of violating. However, we analyze Colonel McHenry's decision in light of the totality of the circumstances. *See Illinois v. Gates* and *United States v. Lopez*, both *supra*. Colonel McHenry had no motive whatsoever to fabricate probable cause. While some of his individual decisions may not have been entirely legally correct, we conclude that, as a whole, his decision that probable cause existed to search appellant's personal computer and his home for obscenity and child pornography was proper.

We uphold the Court of Criminal Appeals' finding that "Colonel McHenry appreciated the legal nature of his magistrate role and that he exercised his responsibilities with great care and thoughtfulness." 42 MJ at 579. We thus also uphold the Court of Criminal Appeals' conclusion that "Colonel McHenry applied the totality of circumstances standard and issued a search authorization based upon a probable cause belief

that criminal evidence would be found in appellant's residence." 42 MJ at 579, *citing Illinois v. Gates* and *United States v. Lopez,* both *supra.*

Our holding that the "Zirloc" search was invalid renders the evidence which is the basis for the indecent-language specifications inadmissible. Thus, there is insufficient evidence to sustain the conviction of specifications 1 and 2 of the Charge. Those specifications will be dismissed. This action necessitates further consideration of the sentence at the trial level.

## II. Instructions on Findings

### A. Scienter Element as to Age of Subjects of Child Pornography

 The standard of review for examining the military judge's refusal to give a defense-requested instruction is abuse of discretion. *United States v. Damatta–Olivera,* 37 MJ 474, 478 (CMA 1993). As one circuit has explained:

> In assessing whether the court properly exercised [its] discretion, a reviewing court must examine the instructions as a whole to determine if they sufficiently cover the issues in the case and focus on the facts presented by the evidence. The question of whether a jury was properly instructed in a question of law, and thus, our review is *de novo.*

*United States v. Snow,* 82 F.3d 935, 938–39 (10th Cir.1996).

 The military judge instructed the members that they must find "[t]hat one or more of [the visual] depictions were of minors engaged in sexually explicit conduct" and "[t]hat the receiving or transporting [of such depictions] was done knowingly: that is, that at the time the accused transported or received the visual depictions, he ... knew

or believed that one or more of the persons depicted were minors." (R.682) Defense counsel had unsuccessfully objected to the "or believed" language at the pre-instruction session. (R.647–48)

The defense argues that "this instruction permitted the court members to find Colonel Maxwell guilty without actual knowledge that minors were depicted in the prosecution exhibits." Counsel asserts that this allowed a conviction if the members found that appellant "thought" the actors "were under 18 years of age, even though he didn't know." Final Brief at 65. They contend that "actual knowledge of the minority of the actors is an essential element of an offense under § 2252, not some sort of belief or supposition." Final Brief at 66.

We do not agree. First and foremost, we are satisfied that there is ample evidence that in fact the actors in the prosecution exhibits that were the basis for the charge under § 2252 were minors. Second—we recognize that the scienter requirement imposed by *United States v. X–Citement Video, Inc.,* 513 U.S. 64, ———, 115 S.Ct. 464, 472, 130 L.Ed.2d 372 (1994), relates to the character of the material, as well as the age of the individuals posed in the materials. However, we do not believe that in taking steps to eradicate the evil of child pornography, Congress intended to erect a virtually insuperable barrier to prosecution by requiring that a recipient or a distributor of pornography must have knowledge of the actual age of the subject, which could only be proved by ascertaining his identity and then getting a birth certificate or finding someone who knew him to testify as to his age. Instead, we are satisfied that the crucial fact which the Government had to prove was that the subjects were minors. That being the case, as it was here, it then was only necessary to prove that appellant believed[7] they were minors.

---

7. We have found cases stating that § 2252(a)(2) requires proof that the accused "knew that the materials depicted a person under the age of 18 engaged in sexually explicit conduct." *United States v. Cedelle,* 89 F.3d 181, 185 (4th Cir.1996); *see United States v. Kimbrough,* 69 F.3d 723, 733 (5th Cir.1995); *United States v. Burian,* 19 F.3d 188, 191 (5th Cir.1994). None of these cases dealt with the validity of the proposition that a

belief that the actor is under 18 does not comply with § 2252(a)(2). In *Cedelle* the court relied on the fact that the letters he sent to order the material contained clear evidence of knowledge that the subjects were under age 18; that the defense never claimed lack of actual knowledge; and that there was "no evidence that would even arguably support a conclusion that he did not" have such knowledge to decline to find plain

There is ample circumstantial evidence of such a belief, as shown by the e-mail comments which accompanied the exhibits. On the other hand, we recognize that a reasonable belief that the individuals depicted were of legal age might be a defense, but that is not an issue here.

### B. Community Standards as to Obscenity

■ We review *de novo* the question of law whether the judge properly instructed the members regarding community standards for obscenity. *See Snow, supra* at 939.

■ The judge instructed that obscenity is to be judged from the standpoint of "our nationwide community as a whole." (R.679) He went on to state:

> that is to say, by society at large or people in general; ... you are to consider the community as a whole, young and old, educated and uneducated, the religious and irreligious.

We hold that this instruction was improper. First, we disagree with the Court of

---

error in the failure to instruct on knowledge of age. 89 F.3d at 186. In *Kimbrough* there was an instruction that one element was "[t]hat the defendant knew that at least one of the performers ... was a minor." The court cited *Burian* for the "holding that Section 2252 requires 'actual knowledge or reckless disregard of the performer's minority.'" *Burian* was deemed to be good law even though it was decided before the Supreme Court's decision in *X–Citement Video.* 69 F.3d at 733. *See Burian,* 19 F.3d at 190–91. Burian had stipulated "that he '... [knew] that [the evidence in question] ... contained visual depictions of minors engaged in sexually explicit conduct.'" *Id.* at 190.

On the other hand, in *United States v. Duncan,* 896 F.2d 271 (7th Cir.1990), the court rejected the claim that the evidence was insufficient to show his "knowledge ... that the photographs he had ordered were to depict children engaged in sexually explicit conduct." 896 F.2d at 277. The court relied on the contents of advertisements ("boys and girls in sex action"; "Young boys in sex action fun") as well as titles offered ("School Girls and Boys"; "Lolita"; "Loving Children"; "Joyboy") as sufficient evidence "to make anyone ... aware of the fact that child pornography was being offered." Indeed the opinion says that "some of these titles would have placed Duncan on notice that he was ordering child pornography." The court recited similar material as evidence of the requisite knowl-

Criminal Appeals' conclusion that the instruction stating that the community was "the nationwide community as a whole, ... young and old," 42 MJ at 582, was acceptable because it referred to the nationwide Air Force community. While the judge might have intended the members to use this specific community, the instruction did not specify that this was the community in question. Instead, the judge merely instructed that the relevant community was "our nationwide community as a whole, ... young and old." No further guidelines or standards were given. This instruction is not consistent with the law governing this area. *See Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973); *United States v. Hullett,* 40 MJ 189 (CMA 1994).

In *Miller* the Supreme Court specifically rejected application of a nationwide standard, stating: "It is neither realistic nor constitutionally sound to read the First Amendment as requiring that the people of Maine or Mississippi accept public depiction of conduct found tolerable in Las Vegas, or New York

---

edge. Surely, common experience teaches that advertisements and titles of offerings are only evidence of a belief in what they say, not actual knowledge. Yet the court said that was sufficient to satisfy the statutory requirement of knowledge. 896 F.2d at 278. We are convinced that an instruction allowing such a conclusion is similarly sufficient. Finally, *United States v. Brown,* 862 F.2d 1033 (3d Cir.1988), involved evidence that Brown "intended to receive, and thus did knowingly receive, child pornography." This ("knowing receipt") was proved by "his strong interest in receiving child pornography ... and his solicitation of child pornography as expressed in his letter and other correspondence...." *Id.* at 1038. The court also referred to evidence in "two catalogues" to support an inference of knowing receipt of child pornography. Then the court proceeded to find sufficient evidence of the requisite "state of mind" showing "what Brown believed it [the tape] depicted." Judge Cowen went on to say: "Brown's understanding on that score came from the catalogue and, based on the catalogue's description ..., the jury was justified in concluding that Brown believed it depicted *minors engaged in sexually explicit conduct.*" 862 F.2d at 1039. There is thus some authority to support the "knew or believed" language of the instructions. That this authority predated the Supreme Court's *X–Citement Video* decision does not diminish its continuing validity in light of *Kimbrough.*

City." 413 U.S. at 32, 93 S.Ct. at 2619. The Court of Criminal Appeals interpreted the given instruction as allowing the panel "members to consider the Air Force as a nationwide community" in the absence of any explicit instruction permitting the substitution. 42 MJ at 582. We will not allow or encourage court members to substitute their own judgments of the law in lieu of correctly crafted legal instructions. However, we agree with the Court of Criminal Appeals' ultimate result. Art. 59(a), UCMJ, 10 USC § 859(a).

We agree that an Air Force community standard was most likely the appropriate community in this case. *See United States v. Hullett, supra; United States v. Dyer,* 22 MJ 578 (ACMR 1986); *United States v. Thomas,* 74 F.3d 701 (6th Cir.1996). However, we are not prepared to state unequivocally that an Air Force community standard is the one to apply when the conviction is based upon the U.S.Code. *See Miller v. California,* 413 U.S. at 30–34, 93 S.Ct. at 2618–20. The standard to be used in this case may be the entire community of subscribers to the AOL service or the members of AOL who use a specific bulletin board. *But see United States v. Thomas, supra.* Contrary to the analysis in *Thomas* rejecting application of a cyberspace-community standard to the distribution of obscenity, such a community standard may be just as functional as application of a service-wide standard because of the identifiable, yet expansive and more uniform, nature of a technologically connected community. *Cf. United States v. Thomas, supra; see Dyer,* 22 MJ at 582–83.

■ Nevertheless, we are satisfied that using an amorphous nationwide standard is more favorable to appellant than a homogeneous Air Force standard would be. A more specific instruction would not have changed the result.

■ No defense objection was made to this instruction at trial. The defense had requested a specific community-standard definition in their proposed written instructions, but there was no objection either before or after the judge finished charging the members to the judge's failure to give the requested instruction. We caution counsel that merely requesting an instruction is ordinarily not sufficient to preserve a claim of error based on that request. There must be an objection no later than after the instructions are given and before the court is closed for deliberations, stating that the instructions did not adequately cover the matters raised in the requested instruction. *See* RCM 920(f); *United States v. Robinson,* 38 MJ 30, 32 (CMA 1993), citing *United States v. Eady,* 35 MJ 15 (CMA 1992).

Our resolution of this issue makes it unnecessary to invoke this rule in the present case.

## C. Community Standards as to Indecent Language

Appellant also contends that the military judge erred in his instructions to the members as to relevant community standards for the indecent-language specifications. Because we have held that the evidence of the indecent language e-mail was inadmissible, this issue is moot.

## III. Indecent Language and the First Amendment

We also need not reach this issue, because we hold the evidence supporting these specifications was inadmissible as a matter of law.

## IV. Constitutionality of Sentence to Dismissal

We need not reach the issue concerning appellant's sentence to a dismissal, because as a result of our evidentiary ruling, the convictions of two of the four specifications of which appellant originally stood convicted cannot stand. Thus, further consideration of the sentence is required at the trial level. However, we comment briefly on the constitutional question presented. First, we do not concur with the Court of Criminal Appeals' reliance on *United States v. Healy,* 26 MJ 394 (CMA 1988), which dealt with appropriateness, rather than constitutionality, of the sentence. As appellant correctly points out in his brief, this is a separate issue entirely.

■ The Eighth Amendment's proscription of cruel and unusual punishments "prohibits not only barbaric punishments, but

also sentences that are disproportionate to the crime committed." *Solem v. Helm,* 463 U.S. 277, 284, 103 S.Ct. 3001, 3006, 77 L.Ed.2d 637 (1983). Justice Powell went on to remind us that "no penalty is *per se* constitutional." *Id.* at 290, 103 S.Ct. at 3009. The criteria that should be used to analyze whether a sentence is objectively constitutional under the Eighth Amendment are: "(i) the gravity of the offense and the harshness of the penalty; (ii) the sentences imposed on other criminals in the same jurisdiction," that is, whether more serious crimes are subject to the same penalty or to less serious penalties; "and (iii) the sentences imposed for commission of the same crime in other jurisdictions." 463 U.S. at 292, 103 S.Ct. at 3011.

In *Harmelin v. Michigan,* 501 U.S. 957, 1005, 111 S.Ct. 2680, 2707, 115 L.Ed.2d 836 (1991), three Justices concluded "that intrajurisdictional and interjurisdictional analyses are appropriate only in the rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality.... The proper role for comparative analysis of sentences, then, is to validate an initial judgment that a sentence is grossly disproportionate to a crime." Since two other Justices would abrogate the *Solem* rule entirely, 501 U.S. at 965, 111 S.Ct. at 2686, this middle ground seems to be the present law of proportionality.

The issue presented by *Solem* was whether the Eighth Amendment proscribes a life sentence without possibility of parole for a seventh non-violent felony. The Court answered in the affirmative. The issue in *Harmelin* was whether a sentence of life imprisonment without parole for possession of 672 grams of cocaine was disproportionate. A 5–4 majority answered in the negative. In the case *sub judice,* the issue is whether a sentence to dismissal, equivalent to deprivation of approximately $1,000,000.00 in lifelong vested retirement income and benefits, is grossly disproportionate, and thus unconstitutional, for a first non-violent felony of trafficking in child pornography.

Justice Powell in *Solem* summarized the history of proportionality as follows:

The principle that a punishment should be proportionate to the crime is deeply rooted and frequently repeated in common-law jurisprudence. In 1215 three chapters of Magna Carta were devoted to the rule that 'amercements'[8] may not be excessive. And the principle was repeated and extended in the First Statute of Westminster, 3 Edw. I, ch. 6 (1275). These were not hollow guarantees, for the royal courts relied on them to invalidate disproportionate punishments. *See, e.g., Le Gras v. Bailiff of Bishop of Winchester,* Y.B. Mich. 10 Edw. II, pl. 4 (C.P.1316), reprinted in 52 Selden Society 3 (1934).

463 U.S. at 284–85, 103 S.Ct. at 3006 (footnote omitted). He continued: "[O]ur Bill of Rights was designed in part to ensure that these rights were preserved. Although the Framers may have intended the Eighth Amendment to go beyond the scope of its English counterpart, their use of the language of the English Bill of Rights is convincing proof that they intended to provide at least the same protection—including the right to be free from excessive punishments." *Id.* at 286, 103 S.Ct. at 3007.

However, "[t]his Court has expressly refused to evaluate the appropriateness of individual court-martial sentences, particularly in those cases where the court below exercised its unique factfinding powers under Article 66, Uniform Code of Military Justice, 10 USC § 866, and determined the sentence was correct in law and fact." *United States v. Olinger,* 12 MJ 458, 460 (CMA 1982) (emphasis added), citing *United States v. Dukes,* 5 MJ 71, 72–73 (CMA 1978). Judge Fletcher went on to point out: "In enacting the Uniform Code of Military Justice, Congress gave the Boards of Review the power to 'set aside, on the basis of the record, any part of a sentence, either because it is illegal or because it is inappropriate.' S.Rep.No. 486, 81st Cong. 1st Sess. 28 (1949), *reprinted in*

---

8. "An amercement was similar to a modern-day fine. It was the most common criminal sanction in 13th-century England. *See* 2 F. Pollock & F.

Maitland, The History of English Law 513–515 (2d ed. 1909)." 463 U.S. 277, 284 n. 8, 103 S.Ct. 3001, 3024 n. 8, 77 L.Ed.2d 637 (1983).

Index and Legislative History, Uniform Code of Military Justice (1949–50)." 12 MJ at 460 (emphasis added).

While appellant's sentence might seem severe, we do not hold it is unconstitutional for the offenses of which he originally stood convicted. We recognize that a sentence to dismissal is a very harsh punishment. As we observed in *United States v. Ohrt*, 28 MJ 301 (1989), a dismissal for an officer is the equivalent of a dishonorable discharge for enlisted personnel, "in that it expels the offender with disgrace from the" military. 28 MJ at 306, quoting W. Winthrop, *Military Law and Precedents* 433 (2d ed. 1920 Reprint).

Another commentator has also noted:

The punitive discharge was never intended to be a rehabilitative punishment. Historically the punitive discharge came into being at a time when retribution and deterrence were the chief, if not the only, reasons for inflicting punishment. The punitive discharge was designed to sever a servicemember from the military community and to put a mark upon him which would make it difficult for him to reenter the civilian society and economy. The punitive discharge thus had two effects by design: first, it punished by ejection from a familiar society and by imposing social and economic hardships; and, second, it deterred others by its visible, swift, effective and harsh character.

Lance, *A Criminal Punitive Discharge—An Effective Punishment?*, 79 Mil.L.Rev. 1, 17 (1978), quoted at 28 MJ at 306.

 It is without question that the sentence in this case had a substantial impact on appellant, and some might even call it harsh. However, a harsh but lawful sentence is not unconstitutional. Regardless, any issue concerning the sentence in this case is moot, because the sentence must be set aside for determination at the rehearing for the remaining specifications of which appellant now stands convicted. Our opinion here should not be construed as making any comment on this Court's opinion of what an appropriate sentence should be in this case. This is a question we leave entirely to the factfinders. *See United States v. Sumrall*, 45 MJ 207 (1996).

We resolve the rest of the granted issues against appellant.

The decision of the United States Air Force Court of Criminal Appeals is reversed as to specifications 1 and 2 of the Charge alleging communicating indecent language and the sentence. The findings of guilty thereon and the sentence are set aside, and those specifications are dismissed. The record of trial is returned to the Judge Advocate General of the Air Force. A rehearing on sentence based on the remaining findings of guilty may be ordered.

Senior Judge EVERETT concurs.

# APPENDIX 1

AO 106 (Rev. 7/87) Affidavit for Search Warrant 6

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔇𝔦𝔰𝔱𝔯𝔦𝔠𝔱 𝔆𝔬𝔲𝔯𝔱

___EASTERN_____ DISTRICT OF _____VIRGINIA·_____

| In the Matter of the Search of | *UNDER SEAL* |
|---|---|

(Name, address or brief description of person, property or premises to be searched)

NINE STRATUS COMPUTERS LOCATED IN
ROOMS 237, 240 & 247, 2ND FLOOR,
AMERICA ONLINE, INC.
8619 WESTWOOD CENTER DRIVE
VIENNA, VIRGINIA

## APPLICATION AND AFFIDAVIT
## FOR SEARCH WARRANT

CASE NUMBER: 91-1531M

I__Bradley_J._Garrett_____ being duly sworn depose and say:

I am a(n)__Special_Agent,_Federal_Bureau_of_Invesetigatio and have reason to believe
Official Title

that ☐ on the person of or ☒ on the property or premises known as (name description and/or location)

Rooms 237, 240 & 247, 2nd floor, America Online, Inc., 8619
Westwood Center Drive, Vienna, Virginia

in the _____Eastern_____ District of __Virginia_____
there is now concealed a certain person or property, namely (describe the person c property to be seized)

 See Attachment A

which is (state one or more bases for search and seizure set forth under Rule 41(b) of the Federal Rules of Criminal Procedure)
property that constitutes the fruits, evidence and instrumentalities of
crimes against the United States

concerning a violation of Title _____18_____ United States code, Section(s)___2252_____.
The facts to support a finding of Probable Cause are as follows:

 See Attached Affidavit

Continued on the attached sheet and made a part hereof. ☒ Yes ☐ No

Signature of Affiant Bradley W. Garrett
Special Agent
Federal Bureau of Investigation

Sworn to before me, and subscribed in my presence

December 10, 1991 at Alexandria, Virginia
Date City and State
W. Curtis Sewell
United States Magistrate Judge

Name and Title of Judicial Officer Signature of Judicial Officer

## AFFIDAVIT

Your affiant says that the facts in support of the issuance of the search warrant are as follows:

Your affiant is a Special Agent with the Federal Bureau of Investigation stationed in the Washington, D.C. Washington Metropolitan Field Office and have so worked for the past seven years. As an FBI agent I have received special training and courses on the subject of child abuse, sexual abuse, child sexual assault and sexual exploitation of children. My area of expertise as an FBI agent include investigation of those cases involving child sexual assault and sexual exploitation.

I have been the author and affiant of several other search warrants on investigations of child sexual assault and sexual exploitation. I have read and studied over 100 books and articles on the subject of child sexual assault, sexual exploitation of children, child prostitution, and child pornography.

I have viewed thousands of sexually explicit pictures of children, depicting them in the nude, in sexually provocative poses; lewd poses; and engaged in virtually every sex act conceivable.

I have also taken a course on child development and read several articles on the developmental stages of children which has assisted me in recognizing and identifying the ages of children.

I have read and examined various publications written and distributed by pedophile and pedophile organizations which described the acts they desire to commit upon children. I have read various publications produced by the same individuals which seek to encourage sexual relations with children. These same publications spell out the manner in which pedophiles seduce their victims and outline the ways to seek out, find, and successfully molest children.

America Online, Incorporated is a multiple online computer service that offers electronic message bulletin boards enabling its subscribers to post messages that can be read by other subscribers. It also provides an electronic mail service, enabling its subscribers to communicate individually by computer. Such communications are private and are not monitored by AOL.

Roger Dale Dietz, a subscriber to AOL, who resides in Fremont, California, advised FBI Special Agent John P. Rowland that he had accessed a group of individuals who were utilizing the electronic mail services of AOL to exchange, in interstate commerce, pornographic material and pornographic photographs depicting children, specifically young boys. Dietz advised that he first was made aware of the child pornography networking on the AOL system by another AOL subscriber known to Dietz as "CHAMP 1" Dietz advised that he worked with Champ 1 to determine which subscribers were sending child pornography through the AOL system. Dietz provided computer disks to Agent Rowland containing the code names of individuals sending child pornography (see Attachment A) as well as some of the child pornography that Dietz received from these individuals (see Attachment B). The photographs provided by Dietz depict minor boys engaged in sexually explicit poses or engaged in sexual conduct with other minor boys.

Jean Villanueva, Vice President, AOL, advised Special Agent Garrett that Roger Dietz had contacted her and provided Villanueva with the same information that Dietz had given Special Agent Rowland.

Marc Seriff, Senior Vice President, AOL, advised that AOL maintains numerous types of information on their subscribers (see Attachment A), and Seriff advised that AOL, for a brief period of time, stores subscribers' electronic mail communications. Mr. Seriff also informed me that all of the stored electronic mail communications of AOL's subscribers are kept on nine Stratus computers located in rooms 237, 240 and 247, on the second floor of a building located at 8619 Westwood Center Drive, Vienna, Virginia.

Based on my experience in child pornography cases, and after conferring with Villanueva and Seriff, and reviewing the visual depictions in Attachment B, your affiant believes that child pornography has been trans-

mitted through AOL's computer network by subscribers identified in Attachment A and that evidence of said communications is presently being stores in AOL's computers at 8169 Westwood Center Drive, Vienna, Virginia, in violation of Title 18, United States Code, Section 2252.

FURTHER THIS AFFIANT SAYETH NOT.

/s/ Bradley J. Garrett
BRADLEY J. GARRETT
Special Agent
Federal Bureau of Investigation

Subscribed to and sworn before me this 10th day of December, 1991.

/s/ W. Curtis Sewell
W. CURTIS SEWELL
U.S. Magistrate Judge
Eastern District of Virginia

## APPENDIX 2

AO 93 (Rev. 5/85) Search Warrant

FILED

DEC 1 0 1991

# United States District Court

_____EASTERN_____ DISTRICT OF _____VIRGINIA_____

In the Matter of the Search of

(Name, address or brief description of person or property to be searched)

NINE STRATUS COMPUTERS LOCATED IN
ROOMS 237, 240 & 247, 2ND FLOOR,
AMERICA ONLINE, INC.,
8619 WESTWOOD CENTER DRIVE
VIENNA, VIRGINIA

UNDER SEAL

## SEARCH WARRANT

CASE NUMBER: 91-1531M

TO: __Bradley J. Garrett, SA, FBI__ and any Authorized Officer of the United States

Affidavit(s) having been made before me by ____Bradley J. Garrett____ who has reason to
Affiant

believe that ☐ on the person of or ☒ on the premises known as (name, description and/or location)

Rooms 237, 240 and 247, 2nd floor, America Online, Inc.,
8619 Westwood Center Drive, Vienna, Virginia

in the_____Eastern_____ District of ____Virginia____ there is now
concealed a certain person or property, namely (describe the person or property)

See Attachment A

I am satisfied that the affidavit(s) and any recorded testimony establish probable cause to believe that the person
or property so described is now concealed on the person or premises above-described and establish grounds for
the issuance of this warrant.

YOU ARE HEREBY COMMANDED to search on or before ____December 20, 1991____
Date

(not to exceed 10 days) the person or place named above for the person or property specified, serving this warrant
and making the search (in the daytime — 6:00 A.M. to 10:00 P.M.) (at any time in the day or night as I find
reasonable cause has been established) and if the person or property be found there to seize same, leaving a copy
of this warrant and receipt for the person or property taken, and prepare a written inventory of the person or prop-
erty seized and promptly return this warrant to _____
U S Judge or Magistrate
as required by law.

____December 10, 1991____ at ____Alexandria, Virginia____
Date and Time Issued City and State
 W. Curtis Sewell
 United States Magistrate Judge

Name and Title of Judicial Officer ATT't 3 To APP Ex XI Signature of Judicial Officer See Page 31

### ATTACHMENT A

Nine Stratus computers containing the following information pertaining to the below–listed customers/subscribers of America On-line, Inc., a computer bulletin board and electronic mail services company.

1. Name;
2. Address;
3. Telephone number;
4. Billing information;
5. Session Detail for six months;
6. Account histories;
7. Validation of authenticity of Jean V1 E Mail;
8. Contents of each message in the E Mail of each specified user;
9. List used network node;
10. Which service/PC type;
11. Create/Cancel date.

*User List*

| | | | |
|---|---|---|---|
| JEANV1 | LITLBOY | COOLGUY16 | EORE |
| NEWBOY13 | ZACK14 | JERIMIAH | BIGGIFGUY |
| SHANEDUDE | STRYKER69 | BRIAN0015 | JOCKMAN |
| SCHARB | BRYANV | FORTYMAN5 | CHAD69 |
| CHAMPONE | BOB583 | NEWPORTGUY | MIKETYLER |
| MYSTERY666 | CTDUDE2 | CHETDW2 | LANGSTONE |
| TUNDRAERIK | BLUEEYES52 | BOBL30 | BOBS83 |
| BOY10 | BOYISH | BRIANH23 | BRUCEG26 |
| BUDZ | BUMBLEBEEL | CLARK10 | CPTGIJO1 |
| CUETO1 | CALJOHN1 | AOMAC2PC | KEVIN10490 |
| JOHNM9630 | THEBIGMAC | MACFAIRY | FORETEEN |
| REDDEL | AGOODGIF | CTDUDE2 | MICHAEL00 |
| MARKAARON | BIKERBOYI | SAMD521 | HOSER9011 |
| MIKEW63 | TOPMASTER | SILENTBOY | JACKS66 |
| SPARROWHAWK | TEX9 | ENDERCA | IN2YOUNG |
| SUNDAY0 | DADDY02173 | JIMC8608 | BOYOHBOY |
| REB4356653 | PENTANE | OHIOBOY69 | ANDREW1858 |
| PLIER | KEVIN16YR | RYANTURTLE | JOHNDARK |
| BOYLOVRRR | ALEXJR | JACKS66 | MIKEW63 |
| BRIAN00001 | JCA2 | KIDDUDE | TIMTT |
| BRIANH23 | CTBOY | SLOWSAM | JOCKMAN |
| BRYANV | FORTYMAN5 | CHAD69 | ALEXJR |
| SLOWSAM | | | |

---

SULLIVAN, Judge (concurring):

I concur in the excellent opinion of my brother, and observe that appellant appears to have been traveling in the Gutter of the Information Highway.

GIERKE, Judge, with whom CRAWFORD, Judge joins (concurring in part and dissenting in part):

I agree with the majority's resolution of all issues except Issue III, pertaining to the FBI's search of the AOL computers pursuant to a warrant issued by a United States Magistrate Judge. 45 MJ at 419–23. The majority holds that the search for e-mail under the screen name Zirloc was outside the scope of the warrant, making the fruits of that search inadmissible. Accordingly, the majority overturns the decision below to the extent it affirms appellant's conviction of specifications 1 and 2 of the Charge, which were based on the search of the Zirloc e-mail.

In my view the search of the Zirloc e-mail was lawful for three reasons. First, the Zirloc e-mail was included within the express terms of the warrant. Second, even if not included within the express terms of the warrant, it was discovered and seized in good faith. Finally, even if not included within the

434

express terms of the warrant, it would have been inevitably discovered.

With respect to the terms of the warrant, I disagree with the majority's assertions that the search warrant obtained by the FBI "was limited to screen names"; that "the FBI had probable cause only as to the listed screen names"; and that "inclusion of e-mail associated with screen names not listed in the warrant created a scope of seizure much larger than that established by probable cause." 45 MJ at 419, 420. In my view, the FBI had authority under the warrant to search all e-mail of the user, Colonel Maxwell. All participants in the investigation understood that the targets of the investigation were users, not screen names or mail boxes.

The terms of the warrant authorized a search for the e-mail of "the below-listed customers/subscribers" known by the listed screen names. It authorized seizure of the "[c]ontents of each message in the E mail of each specified user." (*See* Appendix 2 to majority opinion.) In my view the majority erroneously treats each screen name as a separate user. While it is theoretically possible for more than one person to use the same screen name, that is not the case before us. If there were another user of the screen names Redde1 [as in Ready One] or Zirloc, that user, and not Colonel Maxwell, would have standing to object to the invasion of his or her privacy. The warrant authorized a search for the e-mail of the "customer/subscriber" using the screen name Redde1, but the warrant was not limited to e-mail using that screen name. I agree with the majority that the warrant was not overly broad. Thus, I conclude that a search of the e-mail of Zirloc was lawful as expressly authorized by the warrant.

Furthermore, even if the search of the Zirloc e-mail was not expressly permitted by the warrant, I agree with the court below that the search and seizure were conducted in good faith, relying on the warrant. *See* Mil.R.Evid. 311(b)(3), Manual for Courts-Martial, United States (1995 ed.); *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984); *United States v.*

*Chapple,* 36 MJ 410 (CMA 1993); *United States v. Lopez,* 35 MJ 35 (CMA 1992). As the majority recognizes, this "case takes us into the new and developing area of the law addressing the virtual reality of 'cyberspace.'" 45 MJ at 410. The long analysis set forth by the majority dramatically demonstrates the difficulty of the issues in this case and the likelihood that reasonable minds would interpret the terms and limitations of the warrant differently. In my view, the FBI agents and AOL reasonably interpreted the warrant to authorize the search of the e-mail of customers, not screen names, and they did so in good faith. Hence, even if the warrant was intended to authorize searches only of the listed screen names, the search of the Zirloc e-mail was lawful because it was conducted in good faith.

Finally, even assuming *arguendo* that the probable cause and the terms of the warrant extended only to the one listed screen name, Redde1, I am convinced that the screen name Zirloc would have been inevitably discovered. *See* Mil.R.Evid. 311(b)(2); *see also Nix v. Williams,* 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984); *United States v. Kaliski,* 37 MJ 105, 108–09 (CMA 1993) (explains inevitable-discovery rule), citing *United States v. Kozak,* 12 MJ 389, 394 (CMA 1982). The warrant expressly authorized a search of the billing information pertaining to the customer/subscriber using the name Redde1. That billing information was seized (prosecution exhibit 10), and it revealed all of Colonel Maxwell's screen names, including Zirloc. Thus, execution of the warrant, even if limited to the screen name Redde1, would have revealed the name Zirloc. Just as discovery of drugs in one part of an automobile would lead to a search of the rest of the automobile, discovery of child pornography in the e-mail box of Colonel Maxwell under the screen name Redde1 would have inevitably led to a search of the other mail boxes assigned to Colonel Maxwell.

For the foregoing reasons, I dissent from the majority's holding that seizure of the indecent e-mail transmitted under the screen name Zirloc was illegal. I would affirm the decision of the court below in its entirety.