# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

_____

## No. ACM S32506

_____

### UNITED STATES
*Appellee*

**v.**

### Jordan K. HUNT
Senior Airman (E-4), U.S. Air Force, *Appellant*

_____

Appeal from the United States Air Force Trial Judiciary

Decided 11 July 2019

_____

*Military Judge:* Andrew Kalavanos.

*Approved sentence:* Bad-conduct discharge, confinement for 3 months, and reduction to E-1. Sentence adjudged 19 December 2017 by SpCM convened at Seymour Johnson Air Force Base, North Carolina.

*For Appellant:* Major Jarett F. Merk, USAF.

*For Appellee:* Lieutenant Colonel Joseph J. Kubler, USAF; Captain Zachary T. West, USAF; Mary Ellen Payne, Esquire.

Before MAYBERRY, MINK, and LEWIS, *Appellate Military Judges.*

Judge LEWIS delivered the opinion of the court, in which Chief Judge MAYBERRY and Senior Judge MINK joined.

_____

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 18.4.**

_____

LEWIS, Judge:

A military judge convicted Appellant, contrary to his pleas, of two specifications of wrongful distribution of marijuana,[1] in violation of Article 112a, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 912a.[2] The military judge sentenced Appellant to a bad-conduct discharge, confinement for three months, and reduction to the grade of E-1. The convening authority approved the adjudged sentence.

Appellant raises three issues on appeal: (1) whether the military judge erred when he did not suppress the forensically extracted contents of Appellant's cell phone; (2) whether the military judge abused his discretion by admitting a Universal Forensic Extraction Device (UFED) report from the search of Appellant's cell phone; and (3) whether the evidence is legally and factually sufficient to prove Appellant distributed marijuana. We find no prejudicial error and we affirm the findings and sentence.

## I. BACKGROUND

In March 2017, Appellant invited A1C TM to accompany him to a comedy show in Raleigh, North Carolina. Appellant told A1C TM that he was going to get marijuana before the trip and that he planned to distribute the marijuana to two of his friends, A1C LH and JF.

Unbeknownst to Appellant, A1C TM was a confidential informant for the Air Force Office of Special Investigations (AFOSI). A1C TM previously told AFOSI that she thought Appellant may be involved with illegal drugs because about a month earlier she noticed he smelled like marijuana. At AFOSI's request, A1C TM subsequently developed a friendship with Appellant and offered to be his designated driver on the trip to Raleigh.

Prior to the trip, AFOSI agents fitted A1C TM's vehicle with recording equipment. At trial, the Prosecution admitted several video clips obtained from

---

[1] The military judge announced findings of guilt to both specifications but entered no finding as to the charge as required by Rule for Courts-Martial (R.C.M.) 918(a)(2) and 922(c). *See Manual for Courts-Martial, United States* (2016 ed.) (*MCM*), pt. II. Appellant does not raise and we do not find material prejudice from this error. Article 59(a), Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 859(a) (2016); *see also* R.C.M. 918(a)(2), Discussion (where there are two or more specifications under one charge, conviction of any of those specifications requires a finding of guilty of the corresponding charge).

[2] All references in this opinion to the UCMJ, Rules for Courts-Martial, and Military Rules of Evidence are found in the *MCM* (2016 ed.).

the installed recording device. During her testimony, A1C TM further explained the video clips. Together, the clips and her testimony indicate (1) Appellant told A1C TM that they would be transporting marijuana; (2) the two debated where the marijuana would be placed in the car, and (3) Appellant explained, in detail, how he obtained the marijuana.

On the trip, A1C TM drove Appellant to the Crabtree Valley Mall so they could meet Appellant's friends inside the Forever 21 store. Upon arrival at the mall, Appellant and A1C TM debated whether to take the marijuana inside or leave it in the car. Eventually, Appellant decided to take the marijuana with him and the two entered the mall. Video footage from Forever 21, admitted into evidence, depicted Appellant and A1C TM by the dressing rooms meeting one male and two females. A1C TM identified the male as A1C LH and the two females as JF and JF's mother. A1C TM testified that she saw Appellant transfer the marijuana to JF's mother when he hugged her.

Upon returning to the car, A1C TM recorded a Snapchat video of herself and Appellant on her phone. AFOSI's recording equipment captured the audio of her Snapchat video. In it, A1C TM announced "this kid almost got me kicked out of the military because he likes to do drug deals in Forever 21." As A1C TM added a caption to the Snapchat video stating that she was an accomplice, Appellant looked at her phone and pointed out "that is not even how you spell accomplice."

Six days after the comedy show, Appellant met A1C TM in her car at the Gold's Gym parking lot in Goldsboro, North Carolina and sold her marijuana. As before, Appellant did not know that A1C TM was acting at AFOSI's behest. A1C TM received $60.00 from AFOSI and used it to buy the marijuana from Appellant. The sale was captured on the AFOSI video equipment in A1C TM's vehicle. Shortly after the transaction, Special Agent (SA) PM from AFOSI retrieved the marijuana from A1C TM's center console where Appellant placed it. Forensic testing confirmed the substance was marijuana and that it weighed approximately three grams.

Approximately five weeks later, Appellant was brought to AFOSI for a subject interview. After an Article 31 rights advisement for distribution of drugs, Appellant initially waived his right to counsel and his right to remain silent and agreed to answer questions. Appellant admitted going to the Crabtree Valley Mall but insisted he had never sold drugs in his life. Appellant ultimately requested counsel during the interview with AFOSI.

The same day as the interview, AFOSI agents obtained search authorization for Appellant's cell phone. Consistent with AFOSI's practice for cell phones at the time, the military magistrate also ordered Appellant to unlock the cell phone via passcode or biometrics. When Appellant was

presented with the military magistrate's order, he unlocked his phone. Appellant did not consent to unlock his phone and only did so after reviewing the order. SA PM could not recall whether Appellant unlocked the phone via passcode or biometrics. SA PM seized the phone once Appellant unlocked it.

## II. DISCUSSION

### A. Motion to Suppress

#### 1. Additional Background

##### *a. The Legal Landscape*

At the time of the search of Appellant's phone, the United States Court of Appeals for the Armed Forces (CAAF) had not decided *United States v. Mitchell,* 76 M.J. 413 (C.A.A.F. 2017). At the time of Appellant's trial, however, *Mitchell* had been decided and was referenced in varying degrees by the parties and the military judge during motion practice. To best understand the military judge's ruling and the challenges to it on appeal, we describe in detail what occurred during motion practice. We note this case involves the intersection of multiple constitutional rights, overlapping statutory protection under Article 31, UCMJ, 10 U.S.C. § 831, and a discussion of exceptions to the exclusionary rule in various military rules of evidence. While we acknowledge the complexity of these legal issues presented, counsel faced with a similar legal landscape in the future would be well served by avoiding the pitfalls we highlight from this case. While the Government's position on appeal and the facts of Appellant's case allow us to complete appellate review without remanding the case to the convening authority for a post-trial evidentiary hearing, such a result may not hold true in future cases. *See United States v. Dubay*, 37 C.M.R. 411, 413 (C.M.A 1967).

##### *b. Motion Practice at Trial*

Appellant filed a timely written motion to suppress his cell phone and all evidence derived from an "unlawful search." At first blush, this may appear to be a classic Fourth Amendment[3] suppression motion, in which the good faith exception under Mil. R. Evid. 311(c)(3) might apply. Similarly, the military judge would have to determine whether appreciable deterrence of future unlawful searches or seizures and the benefits of such deterrence outweigh the costs to the justice system before applying the exclusionary rule. Mil. R. Evid. 311(c)(3). But on closer examination, the motion to suppress referenced Appellant being ordered to unlock his phone and argued "[t]he search of SrA Hunt's

---

[3] U.S. CONST. amend. IV.

phone must be suppressed. *Cf. United States v. Mitchell . . . .*" *Mitchell* involves the Fifth Amendment[4] right to counsel and the application of the plain language of Mil. R. Evid. 305(c)(2) which requires suppression after a violation of the Fifth Amendment right to counsel.

During oral argument, trial defense counsel attempted to explain his citation to *Mitchell*:

> Now I have cited, I agree I have cited to *Mitchell* but I want to be clear that had a (cf) in front there the point being is I don't want to overlook, *Mitchell's* not directly on point[5] I don't think at least the way I read *Mitchell* but I certainly think that *Mitchell* is--has got a lot of discussion there that informs you and how to resolve this issue and that's why I put the (cf) rather than [*see* cite] . . ., in other words completely relying on it as authority.

Trial defense counsel concluded the search was unreasonable because the order from the military magistrate to unlock the phone was ". . . an unlawful order because [you are] ordering him to violate his Fifth Amendment right[6] and Article 31." Appellant did not testify for a limited purpose during the suppression hearing. *See* Mil. R. Evid. 304(f)(3); Mil. R. Evid. 311(d)(6).

The Government opposed the motion in writing and presented evidence which included the search authorization, the accompanying affidavit, and the order from the military magistrate for Appellant to unlock his phone via passcode or biometrics.[7] The trial counsel's written motion response summarized *Mitchell* and concluded "even assuming that the Government violated [Appellant's Fifth] Amendment rights when he was ordered to unlock his phone after invoking his right to counsel, the inevitable discovery exception

---

[4] U.S. CONST. amend. V.

[5] Trial defense counsel did not explain why *Mitchell* was not on point and the military judge did not inquire further. We recognize the parties and military judge may have clearly understood trial defense counsel's argument on why *Mitchell* was not on point. Whatever their understanding may have been, it is not contained in the record of trial.

[6] Trial defense counsel did not specify whether it was the Fifth Amendment right to counsel, the Fifth Amendment right against self-incrimination, or both that the Government violated. The military judge did not require trial defense counsel to specify further the grounds for the suppression motion. *See* Mil. R. Evid. 304(f)(4).

[7] Trial counsel did not request the military judge consider the video recording of Appellant's interview with AFOSI as evidence during motion practice. The Government later offered the interview as Prosecution Exhibit 10 during its case-in-chief at which point the military judge admitted a portion of the video into evidence.

applies."[8] The trial counsel also posited that Mil. R. Evid. 311(c)(3)'s good faith exception applied as *Mitchell* was decided after the AFOSI search. Finally, the trial counsel noted suppression was not appropriate under Mil. R. Evid. 311(a)(3) as the exclusion would not result in appreciable deterrence of future unlawful searches and seizures and the benefits of such deterrence did not outweigh the costs to the justice system.

The Government called two witnesses, A1C TM and SA PM, to testify during the motion to suppress hearing. A1C TM testified that she exchanged text messages with Appellant while working as an informant, that she showed all the texts to AFOSI, and that she sent AFOSI screenshots of some of the texts.[9] SA PM testified regarding the steps he would have taken with A1C TM and her phone if Appellant refused to unlock his phone. SA PM did not testify that he would have sent Appellant's phone for forensic testing in an attempt to access its contents without Appellant's passcode or biometrics.

The military judge made findings of fact regarding Appellant's texts with A1C TM. We adopt them as they are not clearly erroneous.

> [A1C TM] provided copies of text[s] between her and [Appellant] related to the charged misconduct to [AFOSI] but did not provide all of the texts. If [Appellant] had refused to unlock the phone [AFOSI] would have requested from [A1C TM] that she allow access to her phone to retrieve the texts between herself and [Appellant] relevant to the underlying charges. Had [AFOSI] requested, [A1C TM] would have allowed [AFOSI] access to her phone to retrieve all text messages located on her phone between herself and [Appellant]. Had [A1C TM] refused, [AFOSI] would have sought authorization to seize and search [A1C TM's] phone. Prior to [A1C TM] exchanging her cell phone in August 2017, the

---

[8] The Prosecution and military judge relied on *Nix v. Williams*, 467 U.S. 431, 444 (1984), in deciding inevitable discovery applied. We agree that *Williams* applies to Appellant's case even though it involved the Sixth Amendment right to counsel, U.S. CONST. amend VI, which does not apply to Appellant as charges had not been preferred when AFOSI interviewed him. In a 1986 amendment to Mil. R. Evid. 304(b)(2), the inevitable discovery exception was added for evidence that would have been obtained even if the involuntary statement of an accused had not been made. This rule was "based on" *Williams*. *MCM*, App. 22, at A22-11. This "inevitable discovery" exception is now in Mil. R. Evid. 304(b)(3).

[9] The screenshots of the text messages that AFOSI received from A1C TM are not in the record of trial. However, both A1C TM and SA PM testified about them during motion practice.

> text messages at issue between [Appellant] and [A1C TM] were
> located on [A1C TM's] phone.

The military judge delivered his ruling orally on the record and supplemented it in writing prior to authentication of the record of trial. The military judge denied the motion to suppress concluding "[a]ssuming that the Government violated [Appellant's Fifth] Amendment rights when he was ordered to unlock his phone after invoking his right to counsel, the inevitable discovery exception applies." Additionally, the military judge concluded that Mil. R. Evid. 311(c)(3)'s good faith exception applied and that, given the timing of the *Mitchell* opinion, suppression would not result in appreciable deterrence of future unlawful searches or seizures and the benefits of such deterrence did not outweigh the costs to the justice system. In his written ruling, the military judge, for the first time, concluded "upon further reflection of the evidence presented at the Article 39(a) motions hearing, this Court now concludes that due to the high likelihood [Defense Computer Forensics Laboratory (DCFL)] would have been able to access the text messages on the accused's phone, all of the text messages would have been inevitably discovered." The military judge's oral ruling did not contain this conclusion about DCFL's capabilities.

### c. Appellate Positions

Before this court, Appellant argues the military judge abused his discretion by: (1) failing to follow *Mitchell*; (2) not applying Mil. R. Evid. 304(a)'s general rule that evidence derived from an involuntary statement is inadmissible; (3) not applying Mil. R. Evid. 305(c)(2)'s specific rule for suppressing evidence derived from a custodial interrogation after a request for counsel; (4) applying various provisions of Mil. R. Evid. 311(c) which are exceptions to unlawful searches and seizures under the Fourth Amendment; (5) determining the contents of Appellant's phone would have been discovered by DCFL; (6) determining the text messages between Appellant and anyone other than A1C TM would have been inevitably discovered; and (7) finding the Government would have inevitably discovered text messages between Appellant and A1C TM.[10] Appellant claims the Government cannot demonstrate the Fifth Amendment violation was harmless beyond a reasonable doubt. We will address Appellant's claims in turn.

On appeal, the Government assumes that if the military magistrate's order violated Appellant's Fifth Amendment rights, then inevitable discovery never-

---

[10] Appellant concedes that the screenshots of text messages between A1C TM and Appellant that were already in AFOSI's possession would "likely" meet the inevitable discovery exception.

theless applied because when the illegality occurred, AFOSI possessed evidence or leads that would have inevitably and lawfully led to the discovery of the same text messages between A1C TM and Appellant. The Government agrees with Appellant that "Mil. R. Evid. 311 does not apply" to Fifth Amendment violations, but argues that Mil. R. Evid. 304(b)(3)'s inevitable discovery exception is analogous to Mil. R. Evid. 311(c)(2)'s inevitable discovery exception. Finally, the Government asserts that even if we find the military judge abused his discretion, the admission of the UFED report was harmless beyond a reasonable doubt.

We find the military judge did not abuse his discretion by admitting the substance of the text messages between Appellant and A1C TM under inevitable discovery. We find he abused his discretion when he determined DCFL would have discovered the full contents of Appellant's phone. However, we find the admission of the UFED report generally and the specific text messages between Appellant and individuals other than A1C TM to be harmless beyond a reasonable doubt.

**2. Law**

We review a military judge's ruling on a motion to suppress for an abuse of discretion, viewing the evidence in the light most favorable to the prevailing party. *United States v. Hoffman*, 75 M.J. 120, 124 (C.A.A.F. 2016) (citing *United States v. Keefauver*, 74 M.J. 230, 233 (C.A.A.F. 2015)). Under this standard, we uphold the military judge's findings of fact unless they are clearly erroneous or unsupported by the record. *United States v. Leedy,* 65 M.J. 208, 213 (C.A.A.F. 2007) (citations omitted). We review de novo any conclusions of law. *United States v. Chatfield,* 67 M.J. 432, 437 (C.A.A.F. 2009) (citations omitted). "The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion. The challenged action must be arbitrary, fanciful, clearly unreasonable, or clearly erroneous." *United States v. Solomon*, 72 M.J. 176, 179 (C.A.A.F. 2013) (quotation omitted). A military judge commits an abuse of discretion when: (1) the findings of fact upon which the ruling is predicated are not supported by the evidence of record; (2) incorrect legal principles are used; or (3) "application of the correct legal principles to the facts is clearly unreasonable." *United States v. Ellis,* 68 M.J. 341, 344 (C.A.A.F. 2010) (citing *United States v. Mackie,* 66 M.J. 198, 199 (C.A.A.F. 2008)).

If an "alleged error is of constitutional dimensions, we must conclude beyond a reasonable doubt that it was harmless before we can affirm." *United States v. Condon*, 77 M.J. 244, 246 (C.A.A.F. 2018) (citation omitted). To conclude that such an error is harmless beyond a reasonable doubt, we must be convinced that the error did not contribute to the verdict obtained. *Id.* (citation omitted). "The Government bears the burden of establishing that any consti-

tutional error is harmless beyond a reasonable doubt." *United States v. Simmons*, 59 M.J. 485, 489 (C.A.A.F. 2004) (citation omitted). It is not that the factfinder was "totally unaware of that feature of the trial later to be held erroneous" but rather, "to find that error unimportant in relation to everything else" the factfinder considered on the issue in question, as revealed in the record. *United States v. Moran*, 65 M.J. 178, 187 (C.A.A.F. 2007) (citation omitted).

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. "The values protected by the Fourth Amendment . . . substantially overlap those the Fifth Amendment helps to protect." *Schmerber v. California*, 384 U.S. 757, 767 (1966).

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . ." U.S. CONST. amend. V. "To qualify for the *Fifth Amendment* privilege, a communication must be testimonial, incriminating, and compelled." *Hiibel v. Sixth Judicial Dist. Court*, 542 U.S. 177, 189 (2004) (citation omitted). "[T]o be testimonial, an accused's communication must itself, explicitly or implicitly, relate a factual assertion or disclose information." *Doe v. United States*, 487 U.S. 201, 210 (1988). "It has, however, long been settled that [Fifth Amendment] protection encompasses compelled statements that lead to the discovery of incriminating evidence even though the statements themselves are not incriminating and are not introduced into evidence." *United States v. Hubbell*, 530 U.S. 27, 37 (2000). "The privilege afforded not only extends to answers that would in themselves support a conviction under a federal statute but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the claimant for a federal crime." *Id.* at 38 (quotation omitted).

As "[t]he circumstances surrounding in-custody interrogation can operate very quickly to overbear the will of one merely made aware of his privilege by his interrogators . . . the right to have counsel present at the interrogation is indispensable to the protection of the Fifth Amendment privilege." *Miranda v. Arizona*, 384 U.S. 436, 469 (1966). In *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981), the Supreme Court of the United States added a second prophylactic layer against potential law enforcement misconduct during suspect interviews. *See also Mitchell*, 76 M.J. at 419. Once a suspect in custody has "expressed his desire to deal with the police only through counsel, [he] is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication . . . ." *Edwards*, 451 U.S. at 484–85; *see* Mil. R. Evid. 305(e)(3).

"The protections afforded to servicemembers under Article 31(b), UCMJ, are in many respects broader than the rights afforded to those servicemembers

9

under the Fifth Amendment to the Constitution." *United States v. Evans*, 75 M.J. 302, 303 (C.A.A.F. 2016). "If the Article 31(b) violation also implicates the constitutional rights of the accused, then the harmless beyond a reasonable doubt test applies." *Id.*

Mil. R. Evid. 301(a) establishes a general rule that "[a]n individual may claim the most favorable privilege provided by the Fifth Amendment, Article 31 [UCMJ], or these rules." Mil. R. Evid. 305(c)(2), *Fifth Amendment Right to Counsel*, states "[i]f a person suspected of an offense and subjected to custodial interrogation requests counsel, any . . . evidence derived from the interrogation after such request, is inadmissible against the accused unless counsel was present for the interrogation." The CAAF rejected a challenge that the "derivative evidence" language in the rule was the result of a scrivener's error and applied the plain language of Mil. R. Evid. 305(c)(2). *Mitchell*, 76 MJ at 419–20, n.7.

The CAAF, in *Mitchell*, evaluated whether the inevitable discovery doctrine applied after a violation of the Fifth Amendment right to counsel. *Id.* at 420. The CAAF determined in *Mitchell* for the exception to apply, the Government must "demonstrate by a preponderance of the evidence that when the illegality occurred, the government agents possessed, or were actively pursuing, evidence or leads that would have inevitably led to the discovery of the evidence in a lawful manner." *Id.* (quoting *United States v. Wicks*, 73 M.J. 93, 103 (C.A.A.F. 2014)).[11] "[M]ere speculation and conjecture" as to the inevitable discovery of the evidence is not sufficient when applying this exception. *United States v. Maxwell*, 45 M.J. 406, 422 (C.A.A.F. 1996). This exception is only applicable "[w]hen the routine procedures of a law enforcement agency would inevitably find the same evidence." *United States v. Owens*, 51 M.J. 204, 210–11 (C.A.A.F. 1999) (citation omitted). The doctrine may also "apply where it is reasonable to conclude officers would have obtained a valid authorization had they known their actions were unlawful." *United States v. Eppes*, 77 M.J. 339, 347 (C.A.A.F. 2018) (citation omitted).

### 3. Analysis

We begin by adopting the Government's assumption that Appellant's Fifth Amendment rights were violated. The Government at trial and on appeal used the plural "rights" when describing the violation. We will therefore assume, without deciding, that (1) Appellant's Fifth Amendment privilege against self-

---

[11] We note that *Wicks* is a Fourth Amendment case involving application of the exclusionary rule and the inevitable discovery exception. We follow our superior court's lead in applying *Wicks* and the cases it cites to Appellant's case. *See also United States v. Roa*, 24 M.J. 297, 302–03 (C.M.A. 1987) (C.J. Everett concurring in the result) (J. Sullivan concurring in the result) (applying inevitable discovery in the context of the Fifth Amendment right to counsel).

incrimination was violated as the military magistrate's order to unlock his phone via biometrics or passcode compelled Appellant to communicate information that was testimonial and incriminating; and (2) Appellant's Fifth Amendment right to counsel was violated as he was subject to custodial interrogation without counsel present when he was ordered by the military magistrate to unlock his phone via biometrics or a passcode. By assuming a constitutional violation of both Fifth Amendment rights, we resolve Appellant's first three challenges to the military judge's ruling. Therefore, we need not discuss further whether the military judge abused his discretion by failing to follow *Mitchell*; by not applying Mil. R. Evid. 304(a)'s general rule that evidence derived from an involuntary statement is inadmissible; and by not applying Mil. R. Evid. 305(c)(2)'s specific rule for suppressing evidence derived from a custodial interrogation after a request for counsel.

Turning to Appellant's fourth challenge, we agree that the military judge abused his discretion by applying the good faith exception of Mil. R. Evid. 311(c)(3) and by conducting the balancing test of Mil. R. Evid. 311(a)(3) prior to applying the exclusionary rule. Appellate government counsel also agree that Mil. R. Evid. 311 does not apply to a Fifth Amendment violation. *See also United States v. Bello*, No. ACM S32489, 2019 CCA LEXIS 200, at *17, n. 7 (7 May 2019) (unpub. op.). We conclude the military judge abused his discretion by applying incorrect legal principles—the good faith exception, under Mil. R. Evid. 311(c)(3), and the balancing test of Mil. R. Evid. 311(a)(3)—to Fifth Amendment violations.

We also agree with Appellant's fifth challenge that the military judge's determination that DCFL would have discovered all the text messages on Appellant's phone was unsupported by the record. *See Leedy*, 65 M.J. at 213. We determine that two findings of fact in the military judge's ruling are clearly erroneous because they are unsupported by the record: (1) "Had the accused refused to unlock his cellphone, the AFOSI would have sent the accused's Samsung Galaxy S7 to . . . [DCFL];" and (2) "DCFL had the capability to access the contents of a locked Galaxy S7 phone."

Neither of these findings of fact were contained in the military judge's oral ruling during trial. Rather, they were added in his written ruling, and he acknowledged this shift when he wrote that the decision was made "upon further reflection of the evidence presented at the Article 39(a) motions hearing." We have reviewed the record and did not discover any evidence presented that DCFL would have been able to unlock Appellant's phone. While the Government's motion originally posited that DCFL had such a capability, upon questioning by the military judge, the trial counsel admitted no such evidence was presented. Trial counsel summarized the Government's position as "we know it is possible, but not inevitable." We are uncertain what caused the military

judge's "further reflection" described in his written ruling. We are certain the two findings of fact he made regarding DCFL unlocking Appellant's phone are unsupported by the record of trial in Appellant's case. *Id.* As we determine these two findings of fact are unsupported by the record, we must conclude the military judge abused his discretion by admitting the UFED report *from Appellant's phone* in its entirety. Essentially, if there was no evidence that DCFL could unlock Appellant's phone, then AFOSI would never have been able to obtain the UFED report from Appellant's phone. However, this conclusion does not end the inquiry as AFOSI already possessed the screenshots of some text messages between Appellant and A1C TM and the military judge found AFOSI would inevitably discover the same text messages in the UFED report from A1C TM's phone which we discuss below. We specifically considered whether anything important could only have come from Appellant's phone as reflected in the UFED report. Appellant observes that, without his phone, AFOSI would only be able to "presume" that Appellant himself received and read the text messages. We reject Appellant's conclusion. There was powerful circumstantial evidence from the testimony of A1C TM that Appellant was the one texting her as she worked as a confidential information against him. Further, looking at the substance of the text message responses from Appellant, we can easily conclude he received and read the messages that deal with marijuana. To the extent the UFED report admitted contained different information from the screenshots AFOSI already had and the text messages AFOSI would have inevitably discovered from A1C TM, as discussed below, we find such error was harmless beyond a reasonable doubt. *See Moran*, 65 M.J. at 187.

We also agree with Appellant's sixth challenge that inevitable discovery does not apply to the text messages between Appellant and anyone other than A1C TM. The record contains no evidence, let alone a preponderance of the evidence, that government agents possessed or were actively pursuing leads against JF (a civilian), A1C LH, or any person other than A1C TM. *See Wicks*, 73 M.J. at 103. We find the military judge abused his discretion by not suppressing the text messages between Appellant and everyone else other than A1C TM.

We find the Government met its burden of showing admission of the text messages between Appellant and everyone else besides A1C TM was harmless beyond a reasonable doubt. Excluding those text messages, the Government's case remained very strong. Appellant was caught on video during both drug distributions, and his own words and actions involving marijuana provided ample evidence to result in the conviction and sentence. A1C TM's testimony provided valuable context consistent with the video evidence. We find Appellant's statement to AFOSI that he had never sold drugs in his life to be flatly inconsistent with his distribution of marijuana to A1C TM that was captured on video. AFOSI recovered this marijuana from A1C TM's center console where

Appellant put it. Forensic testing confirmed the substance was marijuana. Further, the text messages between Appellant and A1C TM—which we find would have been inevitably discovered—provided additional corroboration for each of the drug distributions.

We considered that Appellant texted with JF before the comedy show that he "got [JF] some stuff" for their trip to Raleigh. JF texted "some of the good goods" and Appellant texted "Yes, some good goods . . . ." In eight lines of the findings closing argument, trial counsel argued the reasonable inference that these messages show Appellant "got marijuana" to give to JF, A1C LH, and JF's mother. We do not disagree with that inference but we contrast it with trial counsel's first words in closing argument that "the best evidence in this case is the indisputable video evidence." We conclude the text messages about the "good goods" and trial counsel's brief argument did not contribute to the verdict because there was notably stronger video evidence admitted and argued. The video evidence together showed Appellant bringing marijuana into A1C TM's vehicle before the trip to Raleigh, debating whether to bring the marijuana inside the mall, at the Forever 21's dressing room where the distribution took place, and A1C TM's commentary about being an accomplice to Appellant's drug deal inside Forever 21. Any text message references to Appellant possessing "good goods" for JF prior to the first marijuana distribution were unimportant when compared to the evidence admitted from the day of the first marijuana distribution. *See Moran*, 65 M.J. at 187.

The trial counsel made a second reference in closing argument to "those text messages" asking the military judge to "scrub them carefully" to rebut a potential entrapment defense. We find this reference encompasses all of the text messages, including those between Appellant and A1C TM. Thus, the trial counsel would have been permitted to make the same argument even if the military judge had only admitted the text messages between Appellant and A1C TM. We conclude that having more text messages available in evidence for trial counsel's point did not contribute to the verdict, especially as Appellant only provided notice of an entrapment defense rather than actually using it as part of the defense strategy. Additionally, during sentencing argument, the trial counsel did not mention the text messages at all. On the whole, we find both (1) admission of the text messages between Appellant and individuals other than A1C TM and (2) the trial counsel's brief arguments about them to be utterly unimportant in relation to everything else the military judge admitted into evidence and considered in determining a verdict and sentence. *Id.* We conclude the error was harmless beyond a reasonable doubt.

Finally, we resolve Appellant's seventh challenge against him as we find no abuse of discretion by the military judge in determining the Government would have inevitably discovered text messages between Appellant and A1C

TM. AFOSI had screenshots of some of the text messages between A1C TM and Appellant in their possession before the search of Appellant's phone because A1C TM sent them to AFOSI. Even Appellant admits that "it is true" these messages would "likely meet [the inevitable discovery] exception." Certainly, the screenshots of text messages are not derivative evidence of the search of Appellant's phone as AFOSI already had them in their possession. Further, the military judge found as fact that the copies of the texts A1C TM provided related to the charged misconduct. This finding of fact was also supported by the testimony of A1C TM and SA PM. The Government had to prove inevitable discovery applied by a preponderance of the evidence. The military judge applied this burden correctly.

The military judge also found as fact that if Appellant "had refused to unlock the phone" that AFOSI "would have requested from [A1C TM] that she allow access to her phone to retrieve the texts between herself and [Appellant] relevant to the underlying charges." This finding was also supported by the testimony of SA PM and A1C TM by a preponderance of the evidence. At the time Appellant was ordered to unlock his phone, A1C TM was not yet facing a drug investigation by AFOSI. A1C TM had the same phone through August of 2017 which would have given AFOSI more than sufficient time to obtain text messages from A1C TM. Even after this date, A1C TM expected a backup of her text messages to be remotely backed via iCloud to her laptop which she still had. A1C TM testified at trial that she would have consented to give AFOSI the text messages between herself and Appellant that related to the charged misconduct if they had asked.

We have no difference of opinion with the military judge's ultimate conclusion that inevitable discovery applied, though we rely on *Mitchell*, *Roa*, and Mil. R. Evid. 304(b)(3). *See* 76 M.J. at 420, 24 M.J. at 302–03 (C.J. Everett concurring in the result) (J. Sullivan concurring in the result). While the military judge used the word "could" instead of "would" several times in his ruling on inevitable discovery, we do not find he engaged in speculation or conjecture. *See Maxwell* 45 M.J. at 422. Indeed, we conclude that AFOSI possessed a lead that would have inevitably led to the discovery of the evidence. *See Wicks*, 73 M.J. at 103. The lead was specifically that A1C TM had the texts with Appellant on her cell phone and they related to the charged misconduct. The lead existed at the time Appellant was ordered to unlock his phone.

We also reject Appellant's contention that A1C TM's decision to only give AFOSI screenshots of texts, rather than access to her phone, somehow meant she would not have given consent to obtain messages at a later time. A1C TM testified during trial that she would have given consent if requested.

The military judge did not find that inevitable discovery applied on the basis that it was reasonable to conclude AFOSI "would have obtained a valid authorization had they known their actions were unlawful." *See Eppes*, 77 M.J. at 347. The Government requests we look to the evidence presented on the good faith exception as "relevant" to inevitable discovery. We decline the Government's invitation and resolve inevitable discovery based on the above analysis.

Similarly, we do not reach whether AFOSI would have sought search authorization for A1C TM's phone if she refused to consent to release her text messages with Appellant. There was some evidence presented during motion practice about what SA PM would have done if A1C TM refused to consent. We need not decide whether that testimony was sufficient to show a routine procedure of a law enforcement agency that would have inevitably found the text messages with Appellant on A1C TM's phone. *See Owens*, 51 M.J. at 210. We find no abuse of discretion by the military judge in determining AFOSI would have inevitably discovered text messages between Appellant and A1C TM from A1C TM's phone in a lawful manner.

## B. Additional Objections to the UFED Report

### 1. Additional Background

Although we found the military judge abused his discretion in admitting the UFED report as derivative evidence, we also choose to address the other objections to the UFED report Appellant raised on appeal. Prior to the Prosecution offering the UFED report into evidence, SA PM testified about the process used to extract text messages from Appellant's phone. SA PM explained that after Appellant unlocked the phone pursuant to the military magistrate's order, SA PM logged the phone into evidence and began an attempt to pull the entire contents of the phone. However, SA PM testified some cell phones only give the opportunity to pull specific information and Appellant's phone only allowed collection of text messages and multimedia messages which can contain pictures. SA PM reviewed the pertinent text messages that referenced Appellant's involvement with marijuana. SA PM turned the data over to Investigator NS who produced the UFED report. SA PM testified that the excerpt from the UFED report offered into evidence contained text messages between Appellant and A1C TM and text messages between Appellant and JF. SA PM testified that he had reviewed the exhibit the Prosecution was offering into evidence. The Prosecution then offered the 14-page UFED report into evidence.

Trial defense counsel lodged several objections. First, trial defense counsel objected to the text messages on or after 17 March 2017 as irrelevant. The military judge sustained this objection only to the text messages after 17 March 2017. Second, trial defense counsel objected (under Mil. R. Evid. 403)

that the remainder of the exhibit wasted the court's time and clouded the record with more paper. The military judge overruled this objection and admitted the remaining text messages, finding them relevant and determining they were not unfairly prejudicial or a waste of the court's time under Mil. R. Evid. 403. Trial defense counsel did not object to the authenticity of the exhibit.

Before this court, Appellant argues that the military judge abused his discretion by admitting the UFED report when SA PM (1) authenticated a report that he played no role in creating and (2) had no personal knowledge of whether the report accurately reflected the information on Appellant's phone. Appellant posits that SA PM, as a lay witness, was also not qualified to give an opinion about the report's accuracy or completeness. Appellant accurately points out that Investigator NS did not testify as a witness at his trial. The Government disagrees with Appellant on the standard of review and argues that we should test for plain error as Appellant failed to preserve an objection to the authenticity of the exhibit. We agree with the Government that plain error is the correct standard of review.

**2. Law**

Mil. R. Evid. 103(a)(1) generally requires a party to make a timely objection and state the specific ground for the objection unless it is apparent from the context in order to preserve a claim of error. "A party is not necessarily required to refer to a specific rule by citation. A party *is* required to provide sufficient argument to make known to the military judge the basis of his objection and, where necessary to support an informed ruling, the theory behind the objection." *United States v. Datz*, 61 M.J. 37, 42 (C.A.A.F. 2005) (citations omitted). Mil. R. Evid. 103 "should be applied in a practical rather than a formulaic manner." *United States v. Reynoso*, 66 M.J. 208, 210 (C.A.A.F. 2008). If the party fails to preserve such a claim, it is forfeited and the ruling is reviewed for plain error. *Id.* By contrast, the ruling is reviewed for abuse of discretion if the party preserves the claim. *United States v. Lubich*, 72 M.J. 170, 173 (C.A.A.F. 2013) (citation omitted).

The requirement of authentication is satisfied by "evidence sufficient to support a finding that the item is what the proponent claims it is." Mil. R. Evid. 901(a). Evidence may be authenticated, *inter alia*, through the testimony of a witness with personal knowledge. Mil R. Evid 901(b)(1). It may also be authenticated through testimony describing a process or system and showing it produces an accurate result. Mil R. Evid. 901(b)(9). The proponent "needs only to make a prima facie showing" for the item to be admitted as authenticated, and any "flaws in the authentication . . . go to the weight of the evidence instead of its admissibility." *Lubich*, 72 M.J. at 174 (citation omitted). In order to obtain relief under the plain error standard, Appellant must demonstrate error that

was plain or obvious in light of Mil. R. Evid. 901(a)'s standard of sufficient evidence that the item is what the proponent claims it to be.

### 3. Analysis

Trial defense counsel did not object to the UFED report on authenticity grounds. He did not cite Mil. R. Evid. 901. He used no words to indicate any concern about whether the exhibit was what it purported to be—an accurate excerpt of the text messages extracted from Appellant's cell phone. We determine Appellant forfeited a claim of error to authenticity that he now asserts, and we review the military judge's decision to admit the exhibit under the plain error standard. *See Reynoso*, 66 M.J. at 210; Mil. R. Evid. 103(f).

We conclude there was no error, let alone plain error, in the military judge's decision to not exclude the UFED report on authenticity grounds. SA PM testified that he had been trained to do cell phone extractions and he described, in detail, the process he used to personally extract the data contained in the UFED report from Appellant's cell phone. He testified that he reviewed the "pertinent pages" of the data he collected. SA PM recognized the exhibit and knew that Investigator NS produced it. He reviewed the exhibit and believed it contained text messages between Appellant and A1C TM and JF. We find the Prosecution made a prima facie showing of "sufficient" evidence by a witness with personal knowledge to support a finding that the UFED report is what it claims to be. *See* Mil. R. Evid. 901(a), (b)(1). Additionally, we find the process described by SA PM to be a prima facie showing of "sufficient" evidence that described a process or system that produced an accurate result. Mil. R. Evid. 901(a), (b)(9).

Even if we assume it was error to fail to call Investigator NS to testify[12] about his production of the report, that "error" would not have been plain or obvious to the military judge. It was not plain or obvious that the exhibit was anything other than an accurate extract of Appellant's text messages. As SA PM extracted the data himself, the military judge had no reason to question the accuracy of the UFED report. Similarly, it would not have been plain or obvious to the military judge that SA PM did not have sufficient knowledge of whether the UFED extraction process produced an accurate result when SA PM had been trained on the process and testified about the process in detail. As we find no plain or obvious error regarding authenticity, we need not test for material prejudice.

We also considered the UFED report's admissibility in light of relevance under Mil. R. Evid. 401 and waste of time under Mil. R. Evid. 403. We find no

---

[12] Appellant does not raise the Confrontation Clause as a basis for error. U.S. CONST. amend. VI.

abuse of discretion in the military judge's decision to overrule these objections in light of the probative value of the text messages between Appellant and A1C TM about the charged misconduct.

## C. Legal and Factual Sufficiency

### 1. Additional Background

Appellant claims A1C TM (the key eyewitness) was not credible and that her testimony was necessary to interpret the video clips. Appellant points out that A1C TM was a "serious drug user" and testified favorably for the Government to reduce her impending sentence.

SA PM testified how A1C TM was recruited to be a confidential informant and described her performance in that role. In October 2016, AFOSI opened up a development file on A1C TM when her roommate was suspected of using drugs. In January 2017, A1C TM and another Airman were implicated in a theft of chicken wings from the base dining facility. After these incidents, AFOSI interviewed A1C TM and requested she work with them to uncover military members using illegal drugs. A1C TM agreed and received training from AFOSI on their investigations and legal concepts like entrapment.

During trial, A1C TM denied knowing about the AFOSI development file regarding her roommate's drug use until trial defense counsel mentioned it during a pretrial interview. A1C TM also denied wrongdoing in the chicken wings theft investigation and further denied lying about being involved. Both the AFOSI development file and the chicken wings theft investigation occurred prior to A1C TM's work as a confidential informant with AFOSI against Appellant.

At the time of Appellant's trial on 18–19 December 2017, A1C TM was the subject of an open AFOSI investigation after her urine tested positive for two controlled substances. Additionally, SA PM testified that he had concerns about A1C TM working as a confidential informant because she was a manipulative person who liked to control others to better her situation. Trial defense counsel mentioned that A1C TM would testify under a grant of immunity during opening statement. However, A1C TM was not questioned about the grant of immunity or order to testify during her trial testimony.[13]

---

[13] The pretrial allied papers in the record of trial show the Commander, Ninth Air Force, granted A1C TM testimonial immunity and ordered her to testify in Appellant's case. On 13 December 2017, A1C TM acknowledged the grant of immunity and order to testify.

**2. Law**

We review issues of factual and legal sufficiency de novo. Article 66(c), UCMJ, 10 U.S.C. § 866(c); *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted).

The test for legal sufficiency is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 324–25 (C.M.A. 1987) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Importantly, "[t]he term reasonable doubt . . . does not mean that the evidence must be free from conflict." *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018). "In applying this test, 'we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution.'" *Id.* (quoting *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001)) (additional citation omitted). "Our assessment of legal and factual sufficiency is limited to the evidence produced at trial." *Id.* (citing *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A 1993)).

"The test for a factual sufficiency review . . . is 'whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, *the members of the service court are themselves convinced of appellant's guilt beyond a reasonable doubt.*'" *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017) (citation omitted); *see also Turner*, 25 M.J. at 325. "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *Wheeler*, 76 M.J. at 568 (alteration in original) (quoting *Washington*, 57 M.J. at 399). Just as with legal sufficiency, "[t]he term reasonable doubt . . . does not mean that the evidence must be free from conflict." *Id.* (citing *Lips*, 22 M.J. at 684).

**3. Analysis**

Appellant's convictions for wrongful distribution of marijuana required the Government to prove two elements beyond a reasonable doubt: (1) that Appellant distributed marijuana as charged in the two specifications; and (2) that his distribution was wrongful each time. *See MCM*, pt. IV, ¶ 37.b.(3). The term "distribute" means to deliver to the possession of another. *Id.* at ¶ 37.c.(3). Distribution of a controlled substance is "wrongful" if it is done without legal justification or authorization. *Id.* at ¶ 37.c.(5). Distribution of a controlled substance is not wrongful if such acts are: (A) done pursuant to legitimate law enforcement activity; (B) done by authorized personnel in the performance of

medical duties; or (C) done without knowledge of the contraband nature of the substance. *Id.* Distribution may be inferred to be wrongful in the absence of evidence to the contrary. *Id.*

The video equipment installed by AFOSI in A1C TM's car provides compelling evidence to support Appellant's convictions for distribution of marijuana. While portions of the videos are occasionally difficult to hear, Appellant's numerous references to marijuana easily stand out. Additionally, the video clips depict Appellant's demeanor both before and after the first distribution and during the second distribution. Finally, Appellant engaged in several debates with A1C TM on the logistics of transporting and possessing marijuana prior to the first distribution which set the stage for what is observable in the Forever 21 video footage.

We carefully examined the testimony of A1C TM and found her recitation of the events during both marijuana distributions to be consistent with the video evidence admitted during trial. On the first distribution, A1C TM testified to exactly when the marijuana was delivered to JF's mother and the Forever 21 video recording is consistent with her testimony. Also, we found A1C TM's Snapchat video to provide valuable evidence as it was recorded once Appellant and A1C TM got back to her car after the first distribution. A1C TM played back the audio of the Snapchat more than once for Appellant and this playback was recorded by the AFOSI equipment. We find this evidence to be strong corroboration of both A1C TM's testimony and the Forever 21 video footage that Appellant wrongfully distributed marijuana to JF's mother.

The evidence supporting the second distribution of marijuana is even stronger. AFOSI's video equipment captured this transaction from beginning to end. SA PM found the marijuana exactly where the video showed it would be—in A1C TM's center console. Forensic testing confirmed the substance distributed was approximately three grams of marijuana. The video shows Appellant taking cash from A1C TM after he delivers the marijuana to her car's center console.

We considered that A1C TM was actively under investigation for her own drug involvement at the time of her testimony, along with all the other factors in evidence that affected her believability. We find her testimony that she witnessed Appellant distribute marijuana in Forever 21 to JF's mother and that she bought marijuana from Appellant for $60.00 to be credible and supported by the other evidence in this case.

After considering all of Appellant's challenges and drawing "every reasonable inference from the evidence of record in favor of the prosecution," the evidence is legally sufficient to support Appellant's convictions for distribution of marijuana. *Barner*, 56 M.J. at 134. Moreover, having weighed the evidence in

the record of trial and having made allowances for not having personally observed the witnesses, we are convinced of Appellant's guilt of both distributions of marijuana beyond a reasonable doubt. *See Turner*, 25 M.J. at 325. Appellant's conviction for two specifications of distribution of marijuana is therefore both legally and factually sufficient.

## III. CONCLUSION

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the findings and sentence are **AFFIRMED**.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court